UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CEDRIC M. WRIGHT,                     )
                                      )
            Plaintiff,                )
                                      )
      v.                              )      Case No. 4:12CV107AGF
                                      )
ST. LOUIS BOARD OF POLICE             )
COMM'RS, et al.,                      )
                                      )
            Defendants.               )

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Francis Slay, Jr., Thomas Irwin, Bettye Battle-Turner, Richard H. Gray, Daniel Isom, Gerald Leyshock, and Andrew Wismar, by and through counsel, state as follows in support of their Rule 56 motion for summary judgment.

## I.   Introduction

On August 20, 2011, St. Louis Metropolitan Police Department ("SLMPD") police officers Andrew Wismar and Brian Eisele arrested plaintiff Cedric Wright in the City of St. Louis, Missouri for petty larceny.  Ex. C, Deposition of Andrew Wismar, at 21, 23.  Wismar and Eisele arrested Wright after he was positively identified by a Phillips 66 clerk as the man that stole an 18-pack of beer and a bag of chips from her store.  Ex. C at 21-22.

1

After transporting Wright to the South Patrol area station, Wismar performed a search of Wright's criminal history in the Regional Justice Information System ("REJIS"), which revealed three outstanding warrants for an individual named Corey Leonard with an alias of Cedric Wright. Ex. C at 23-24.  After determining that both Wright and Leonard had used each other's names as aliases and comparing the photographs, Wismar believed that they were the same person and booked Wright on the three outstanding warrants, in addition to the petty larceny charge.  Ex. C at 22-24.

Wright was then transported to the City Justice Center early the next morning, where he remained in police custody until August 22, 2011.  Ex. I, Board & Isom's First Supplemental Answers and Objections to Plaintiff's First Set of Interrogatories, at 6; Ex. G, Arrest Register – Prisoner Processing Copy, at 1.  Wright was released to the custody of the St. Louis City Sheriff's Department on the morning of August 22, 2011 and made his initial appearance in circuit court that morning.  Ex. G at 1; Ex. D, Deposition of Cedric Wright, at 122-23.   Wright remained in jail until October 20, 2011 when Circuit Judge John Garvey ordered that Wright be released as he was not the proper defendant with regard to the three criminal cases against Leonard.  Ex. D at 122-23; Ex. J, 10/20/11 Order.

On January 19, 2012, Wright filed a Complaint for Declaratory Judgment and Damages against Francis Slay, Thomas Irwin, Bettye Battle-

Turner, Richard Gray (the members of the St. Louis Board of Police Commissioners), Daniel Isom (former Chief of Police), Gerald Leyshock[1] (former Captain and Commander of the Third District), and police officer Andrew Wismar alleging that his Fourth Amendment rights were violated as a result of the August 2011 arrest.[2]  Doc. 1.

In Count I, Wright alleges that Wismar violated his Fourth Amendment rights by arresting him without probable cause and that the Board, Isom, and Leyshock had a policy or custom that caused this violation and they failed to properly train and supervise their officers in this regard. Doc. 1 at 23-27.  In Count III, Wright alleges that Wismar used excessive force during the arrest and that the Board, Isom, and Leyshock lacked adequate training programs for its police officers in this regard.  Doc. 1 at 30-32.  In Count IV, Wright brings a state law claim against Wismar for false arrest and false imprisonment.  Doc. 1 at 32-33.

## II.   The Rule 56 Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[1] Wright has named the Board members, Isom, and Leyshock in their official capacities only. Doc. 1
[2] On March 28, 2013, the Court dismissed the following claims: the official capacity claims and Count II against Wismar and Count II against the Board members, Isom and Leyshock.  Doc. 73.

moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).  The party opposing summary judgment may not rest upon mere allegations, but must produce significant probative evidence demonstrating a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986).  The movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  A "genuine issue" of fact exists only if a reasonable jury could have found in favor of the opposing party. *Anderson*, 477 U.S. at 248.

## III.  The Court should grant summary judgment in favor of Wismar on Wright's Fourth Amendment claims.

This Court should grant summary judgment in favor of Wismar on Counts I and III because the undisputed facts demonstrate that Wismar did not violate Wright's Fourth Amendment rights in that Wismar had probable cause to arrest Wright for petty larceny and Wismar only used *de minimis* force to effectuate the arrest.

In the alternative, Wismar is entitled to qualified immunity.  Qualified immunity from suit under 42 U.S.C. § 1983 is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 *(1985).*  In resolving the applicability of qualified immunity to particular conduct, the court may consider whether two questions can be answered in the affirmative:  First, whether "the facts alleged show the officer's conduct violated a constitutional right[.]"  *Pearson v. Callahan*, 129 S.Ct. 808, 816 (2009).  Second, "[i]f, and only if, the court finds a violation of a constitutional right, the next, sequential step is to ask whether the right was clearly established at the time of the alleged misconduct."  *Id.* The Court may analyze those questions in the order it chooses.  *Id.* at 818.

## A.   Wismar had probable cause to arrest Wright.

Wismar had probable cause to arrest Wright for petty larceny on August 20, 2011.  When determining whether an arrest violates the Fourth Amendment, the Court should examine "the totality of the circumstances surrounding the arrest to determine its reasonableness."  *Hill v. Scott*, 349 F.3d 1068, 1073 (8th Cir. 2003).  Probable cause for an arrest exists when the arresting officer has knowledge of facts and circumstances, which come from reasonably trustworthy information, that are "sufficient to warrant a prudent

person in believing that the person arrested had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Here, Wismar had probable cause to arrest Wright for petty larceny. Wismar and Eisele initially received information about the theft from SLMPD's dispatcher after a clerk at Phillips 66 called 911 to report the incident.  Ex. A, CD Containing 911 Call/Dispatcher Communications.  The dispatcher informed Wismar and Eisele that a black male in his late 30's or early 40's wearing a white t-shirt and blue jeans had stolen an 18-pack of Icehouse beer from the Phillips 66 gas station at 2327 Gravois and was last seen walking northbound on Jefferson toward Russell.  Ex. A.

Wismar testified that he and Eisele went straight to Fox Park after receiving the radio assignment because they received a good description of the suspect from the dispatcher and they knew that there was a group of individuals that congregated at Fox Park that were known for drinking in the park and stealing beer from the nearby gas stations.  Ex. C at 92-93.  Upon arriving at Fox Park, Wismar and Eisele saw a man that matched the suspect's description holding an 18-pack of Icehouse beer.  Ex. C at 95.  The man immediately put down the beer and began walking away when the officers approached him.  Ex. C at 95.

Wismar and Eisele stopped the suspect, handcuffed him, and drove him to the Phillips 66 station where the clerk positively identified him as the man

6

that stole the beer from her store.   Ex. C at 95-97, 99.   Eisele informed Wright that he was being placed under arrest for petty larceny.  Ex. C at 100. Wismar and Eisele then transported Wright to the South Patrol Division station for booking.   Ex. C at 100.   Wismar testified that it is his general practice to book people for non-traffic related city ordinance violations, which means the arrestee is transported from the scene to South Patrol for booking and then is transported to the City Justice Center.  Ex. C at 32-34.  Sergeant Michael Regan was notified of and approved Wright's arrest.  Ex. C at 78; Ex. I at 3; Ex. E, Field Booking Form, at 1.

Wismar had knowledge of facts and circumstances, based upon reasonably trustworthy information, that were sufficient to warrant a prudent person in believing that Wright had committed petty larceny. Consequently, Wismar had probable cause to arrest Wright for petty larceny. *See Beck*, 379 U.S. at 91. Wright cannot dispute the probable cause as he admitted in his deposition that he did steal beer from the gas station.  Ex. D at 63.

> **1.      Even if Wismar mistakenly booked Wright on the outstanding warrants, Wismar is entitled to qualified immunity because he did not violate a clearly established constitutional right.**

It is unclear if Wright is alleging that Wismar's decision to book Wright on the warrants violated Wright's Fourth Amendment right to be free from

unreasonable searches and seizures.  *See* Doc. 1 at ¶ 97-98.  If so, then Wright's claim fails because such an allegation does not give rise to a constitutional claim.  *See Baker v. McCollan*, 443 U.S. 137, 143 (1979).  In *Baker*, plaintiff Linnie McCollan was arrested pursuant to a warrant that was actually for the arrest of his brother, Leonard McCollan.  *Id.* at 136-37. Despite McCollan's protests that the warrant was not his, he was booked and detained in jail for three days.  *Id.* at 137.  In his § 1983 claim against the sheriff, McCollan did not contest the validity of the warrant under which he was arrested, but rather argued that he was detained despite his protests of mistaken identity for three days.  *Id.* at 143-44.

The Court held that this allegation did not give rise to a claim under § 1983 because McCollan was being detained on a warrant that conformed to the requirements of the Fourth Amendment.  *Id.* at 144.  The Court noted that McCollan could not have been detained indefinitely on the basis that the warrant met the requirements of the Fourth Amendment over his protests of innocence; however, a claim for prolonged detention without due process of law would be analyzed under the Fourteenth Amendment.  *Id.* at 144-45.

Similar to the plaintiff in *Baker*, Wright has not attacked the validity of the warrants under which he was booked; instead he argues that he was misidentified and wrongfully detained as a result.  *See* Doc. 1 at ¶ 97.  This is not a constitutional claim and, even if it was, it would not be analyzed under

the Fourth Amendment.  *See Baker*, 443 U.S. at 142.  Consequently, Wright has failed to allege a constitutional violation that resulted from Wismar's decision to book Wright on the outstanding warrants.

Even if this Court determines that Wright's allegations that he was wrongfully identified and booked under the warrants does give rise to a Fourth Amendment claim, Wismar is entitled to qualified immunity because he reasonably believed that the warrants were for Wright.  "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution."  *Saucier v. Katz*, 533 U.S. 194, 206 (2001).  More specifically, "[o]fficers can make objectively reasonable mistakes about … which individual an arrest warrant names…."  *Engleman v. Deputy Murray*, 546 F.3d 944, 949 (8th Cir. 2008) (citing *Hill v. California*, 401 U.S. 797, 804 (1971)); *Young v. City of Little Rock*, 249 F.3d 730, 734 (8th Cir. 2001).

The Eighth Circuit has held that a police officer's mistaken arrest of an individual based upon a warrant on which her name was only listed as an alias did not give rise to a § 1983 claim.  *Young*, 249 F.3d at 734.  In *Young*, Officer Brown stopped a car, in which plaintiff Willie Mae Young was a passenger, for a traffic violation.  *Id.* at 732.  A computer check revealed an active warrant for Young for failure to report and pay probation fees, so

9

Officer Brown called the police communications operator to verify the warrant. *Id.* The operator verified that the warrant was for Young; however, it was later determined that the warrant was actually for Glenda Marie Walker, Young's sister-in-law, who had used Young's name as an alias. *Id.* The Court held that the operator's mistake was not deliberate and that Officer Brown had an objectively reasonable basis for arresting Young. *Id.* at 734. The Court further held that a mistake made under these circumstances did not amount to an unreasonable arrest within the meaning of the Fourth Amendment and the operator's "mistake, and Officer Brown's reliance on it, amounted to nothing more than negligence, which normally does not give rise to a claim under § 1983." *Id.* at 734.

*Young* governs the instant matter. Wismar decided to book Wright on three additional charges after a criminal history check on Wright revealed three outstanding warrants. After the Phillips 66 clerk positively identified Wright as the person that stole beer from her store, Wismar ran Wright's pedigree information through REJIS using the laptop in his police car. Ex. C at 21-22. Wismar testified that REJIS revealed that Wright had an alias of Corey Leonard and that outstanding warrants for Corey Leonard appeared in Wright's criminal history. Ex. C at 22; 102; Ex. F, Active Warrant. The active warrant included two felony charges and one misdemeanor charge for failing to appear. Ex. C at 106; Ex. F.

10

Wismar testified that he then ran the alias name Corey Leonard in REJIS to check the criminal history associated with that name.  Ex. C at 26-27.  This search revealed that Leonard had an alias of Cedric Wright and an extensive criminal history, including the same active warrant that appeared in Wright's criminal history.  Ex. C at 27.  Wismar informed Wright that he was going to be booked on the outstanding warrants, in addition to the petty larceny charge, and then Wright was conveyed to South Patrol.  Ex. C at 105-06.

At South Patrol, Wismar compared photographs of Wright and Leonard and determined that their bone structure was very similar, they both had "a rounded triangle shape on both of their eyes."  Ex. C at 111, 113, 115.  He also thought that their noses and lips were very similar.  Ex. C at 113. Wismar testified that he believed Wright was Leonard because REJIS indicated that Wright had used the name Corey Leonard as an alias and vice versa and their facial structure and photographs were similar.  Ex. C at 113-14.  As a result, Wismar decided to book Wright on the outstanding warrants. Ex. C at 113.   The booking was approved by the watch commander, Lieutenant Noble.  Ex. C at 79; Ex. G at 1.

While Wismar was performing the REJIS search, Eisele completed the Field Booking Form.  Ex. C at 115.  The Field Booking Form reflects that Wright was being charged with: petty larceny (city ordinance violation),

11

violation of riverboat gambling (felony bench warrant), stealing over $500 (felony bench warrant), and receiving stolen property under $500 (misdemeanor bench warrant).  Ex. E at 1.  Wright testified that he signed the Field Booking Form, on pages 1 and 2, and did not ask any questions about the document.  Ex. D at 156-58.

The Field Booking Form, along with printouts of Wright's criminal history, Leonard's criminal history, the active warrant, and cancelled warrant were provided to the booking clerk, who then generated an Arrest Register.  Ex. C at 82-83, 141; Ex. B, Printout of Wismar's REJIS searches; Ex. F; Ex. H, printout of cancelled warrant.  Wright testified that he signed the Arrest Register on pages 1 and 2.  Ex. C at 158-59.  By signing page 1 of the Arrest Register, Wright certified that his name and personal information on the form were correct and indicated that he understood that false statements are punishable by law.  *See* Ex. G at 1.

Thus, similar to the police officer in *Young*, Wismar had an objectively reasonable basis for arresting Wright and booking him on the warrants because he performed a thorough investigation into Wright's identity by searching REJIS for the criminal history of Wright and Leonard and by comparing their photographs.  *See Young*, 249 F.3d at 734 (officer had an objectively reasonable basis for arresting plaintiff after his car computer

12

showed there was a warrant for her arrest and he verified that information over the radio).

The fact that it was later determined that the warrants were for another individual does not, in and of itself, make Wismar's actions unreasonable.  *See Engleman*, 546 F.3d at 949 (police officers may make objectively reasonable mistakes about who is named in an arrest warrant).

**B.   Any force that Wismar used to effectuate the arrest was only *de minimis*.**

Wright's excessive force claim fails because Wismar reasonably used a small amount of force when effectuating the arrest.  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Samuelson v. City of New Ulm,* 455 F.3d 871, 875 (8th Cir. 2006) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).   The dispositive question is whether the officer's conduct was objectively reasonable under the circumstances, as judged from the perspective of a reasonable officer on the scene at the time the force was applied.  *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011).   In determining whether an officer used excessive force in violation of an arrestee's Fourth Amendment rights, the Court should examine the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Samuelson,* 455 F.3d at 875.

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). "Reasonable applications of force may well cause pain or minor injuries with some frequency." *Chambers*, 641 F.3d at 907. While a plaintiff's *de minimis* injury does not necessarily foreclose the possibility of a Fourth Amendment violation, it can be used to show only a corresponding *de minimis* use of force by the officer, which is insufficient to support a § 1983 claim. *Id.* at 906. Accordingly, the degree of injury is relevant insofar as it tends to show the amount and type of force used. *Id.*

Here, Wismar used *de minimis* force to effectuate Wright's arrest. Wismar testified that Wright was resistant in getting into the police car, so he placed his left foot on the back of the Wright's right knee to get him sit down and then Eisele and him pushed Wright into the car. Ex. C at 95-96. Wright testified that one of the officers slammed the car door on his right leg when he threw Wright into the car; however, Wright could not identify that officer. Ex. D at 162. In addition to the fact that Wright is unable to identify the officer that allegedly slammed the door on him, a reasonable jury could not conclude that anything more than *de minimis* force was used based upon Wright's own testimony. The force used to allegedly slam the door on

14

Wright's leg could not have been substantial as Wright testified that he did not feel any pain in his right leg on the day of the arrest.  Ex. D at 162.

It was not until the next day that Wright felt some pain in his right leg, which he described as a throbbing that lasted for about 10-15 minutes.  Ex. D at 171-72.  Wright testified that he had a knot on his shin for about two weeks, but other than that he did not have any other complaints in his right leg and was not injured anywhere else.  Ex. D at 172.  Wright's own testimony establishes that he suffered nothing more than a *de minimis* injury, which could only have resulted from a *de minimis* use of force by a police officer.  *See Chambers*, 641 F.3d at 906-07.  Wismar's actions were reasonable; and therefore, Wright has failed to prove that Wismar used excessive force in violation of the Fourth Amendment.

IV.  **The Court should grant summary judgment in favor of the Board, Isom, Leyshock on the Fourth Amendment claims.**

The Board[3] cannot be held municipally liable because Wismar did not violate Wright's Fourth Amendment rights and Wright cannot prove causation between a municipal policy, custom, or lack of training or supervision and the alleged constitutional violation.  In order to hold a

_____

[3] The claims against Isom and Leyshock in their official capacities are essentially claims against the Board, so they will be referred to collectively as "the Board."  *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) ("A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity.").

municipality liable under § 1983 the plaintiff must first demonstrate that a municipal employee or official committed a constitutional violation.  *Russell v. Hennepin Cnty.*, 420 F.3d 841, 846 (8th Cir. 2005).  As discussed in Section III, Wismar did not violate Wright's constitutional rights; therefore, the Board cannot be held municipally liable.

However, should the Court find that Wismar did violate Wright's constitutional rights, Wright must then establish that the municipality had a policy or custom that caused the constitutional violation or that the municipality acted with deliberate indifference to the plaintiff's constitutional rights by having inadequate training procedures or supervision in place.  *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citing *City of Canton v. Harris*, 489 U.S. 378, 3788-92 (1989); *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404-07 (1997)).  For the reasons stated below, Wright cannot do so and the Court should grant summary judgment in favor of the Board, Isom, and Leyshock.

A.     **There is no evidence that the Board had a custom or policy of misidentifying arrestees.**

Wright's official policy or custom claim fails because there is no evidence that a policy or custom of the Board caused Wright's alleged Fourth Amendment violations.  "A policy is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final

16

authority regarding such matters." *Mettler v. Whiteledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).   A municipal custom exists when there is: (1) "a continuing, widespread, persistent pattern of unconstitutional misconduct by the municipality's employees," (2) deliberate indifference to or tacit authorization of that conduct by the municipality's policymakers even after receiving notice of that misconduct, and (3) an injury sustained by the plaintiff as a result of the municipality's custom ("i.e., [proof] that the custom was the moving force behind the constitutional violation."). *Id.*   A municipality's failure "to implement a policy that would have prevented an unconstitutional act by an employee otherwise left to his own discretion," is not sufficient to establish liability. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013).   Rather, "notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Id.*

Wright asserts contradictory positions by first alleging that the Board failed to adopt appropriate arrest and identification policies, which lead to his misidentification and apprehension, (Doc. 1 at ¶ 101), and then by alleging that the arrest and detention policies of the Board caused a violation of Wright's constitutional rights (Doc. 1 at ¶ 107).   Nevertheless, both positions fail.   Wright's claim that his misidentification and apprehension were caused by a lack of arrest and identification policies fails as a matter of law because the alleged failure to adopt a policy is not sufficient to give rise to § 1983

liability. *See Atkinson*, 709 F.3d at 1216 (plaintiff's "bare allegation that 'the absence of a binding, written policy on the use of force demonstrated deliberate indifference on the part of the City' is patently insufficient.").

Wright's claim that the arrest and booking policies caused his alleged misidentification and detention also fails because these policies do not direct officers to book individuals on the wrong warrants. Rather, SLMPD had extensive special orders in place setting forth the appropriate procedures for arresting, booking, and processing arrestees, and the use of force. Ex. N, Special Order 8-01, Section IV; Ex. O, Special Order 8-03, Section V; Ex. P, Special Order 8-03, Section X; Ex. Q, Special Order 8-04, Section III. SLMPD also had a special order in place that appropriately directed police officers how and when to use force. Ex. S, Special Order 1-01, Section I; Ex. T, Special Order 1-01, Section III. The Court can decide as a matter of law whether causation exists between a municipal policy and alleged constitutional violation where "the question is so free from doubt as to justify taking it from the fact finder." *Minnesota Majority v. Mansky*, 708 F.3d 1051, 1060 (8th Cir. 2013) (quoting *Parrish v. Ball*, 594 F.3d 993, 1000 (8th Cir. 2010)).

With regard to Wright's claim that the Board had an official custom of misidentifying arrestees, there is no evidence in the record to support this contention. The Internal Affairs Division did not receive any citizen

complaints or internal complaints in the five years prior to 2011 regarding the failure, or alleged failure, of SLMPD officers to properly identify individuals in their custody. Ex. M, Affidavit of Bridget Yates.

Furthermore, Colonel Richard Gray, President of the Board of Police Commissioners, testified that the Board did not became aware of the circumstances surrounding Cedric Wright's arrest and release until after this lawsuit was filed. Ex. U, Deposition of Richard Gray, at 8, 17. Col. Gray testified that the Board discussed the issue of misidentification of arrestees during a closed, executive session with their attorney present after the lawsuit was filed and was not aware of any allegations of misidentification of arrestees by SLMPD police officers prior to that meeting. Ex. U at 11-12. Because there is no evidence in the record that the Board had notice of these complaints, there cannot be a genuine issue of material fact as to whether the Board knew that a lack of written policies about how to properly identify arrestees would likely result in a constitutional violation. Consequently, there is no evidence of the existence of a municipal custom. *See Mettler*, 165 F.3d at 1204.

## B. There is no evidence that the Board had notice of inadequate training.

There is no evidence that the Board had actual or constructive notice of, and therefore was deliberately indifferent to, a need for more or different

training of police officers on how to arrest and detain individuals and when force may be used during an arrest.  A police department can only be held liable for inadequate training of its police officers if those failures amount to "deliberate indifference to the rights of persons with whom the police come into contact." *Robinette v. Jones*, 476 F.3d 585, 591 (8th Cir. 2007) (*citing City of Canton*, 489 U.S. at 388)).  Specifically, the plaintiff must prove that: (1) there was a pattern of similar constitutional violations by untrained employees or that the lack of training was so likely to cause a constitutional violation that the need for the training was patently obvious; (2) the municipality continued to adhere to that training when it knew or should have known that it failed to prevent unconstitutional acts by its employees; and (3) the lack of training actually caused the plaintiff's injuries. *Connick v. Thompson*, 131 S.Ct. 1350, 1360-61 (2011).

As discussed above, there is no evidence of a pattern of similar constitutional violations by police officers of misidentifying arrestees or using excessive force.  Furthermore, the training related to arresting and booking suspects and use of force was appropriate.   Wismar testified that he underwent a nine-month training program in SLMPD's Police Academy.  Ex. C at 13.  His training in the Academy covered all facets of police work, with both classroom instruction on topics such as constitutional law, criminal statutes, report writing, criminal investigations, and use of force, as well as

20

field training related to defensive tactics and firearms training.  Ex. L, Basic Recruit Final Evaluation and Class Schedule.  Wismar testified that he was trained on how to use REJIS and has to renew his certification every three years.  Ex. C at 49.  He also received one-on-one training from his Field Training Officer about how to perform criminal history searches in REJIS. Ex. C at 126.

In addition, Wismar has received annual training every year since graduating from the Academy.  Ex. K, SLMPD Custom - Training Quick. Specifically, he took a seminar on interviewing and interrogation, during which one of the topics that was discussed was how to identify certain physical features in people that do not change over years in order to assist officers in comparing suspects to a person depicted in a photograph.  Ex. C at 35-36; Ex. K at 1.  Wismar also received annual training related to use of force, such defensive tactics training and TASER recertification.  Ex. K at 1. Accordingly, there is no evidence of a lack of training within SLMPD regarding the proper procedures for arresting and booking arrestees and use of force.  As such, Wright cannot prove the causation element of his failure to train claim.  *See Connick v. Thompson*, 131 S.Ct. 1350, 1360-61.

**C.     There is no evidence that the Board had notice of inadequate supervision.**

With regard to Wright's failure to supervise claim, there is no evidence that the Board was deliberately indifferent to or tacitly authorized the misidentification of arrestees by police officers.  Similar to a failure to train claim, a failure to supervise claim is "governed by the deliberate indifference standard" and requires a showing that the employer "demonstrated deliberated indifference or tacit authorization" of the unconstitutional acts. *Liebe v. Norton*, 157 F.3d 574, 579 (1998).  The Internal Affairs Division did not receive any citizen complaints or internal complaints in the five years preceding 2011 regarding the failure, or alleged failure, of SLMPD officers to properly identify individuals in their custody.  Ex. M.  In addition, the Board did not have notice of any allegations of misidentification of arrestees by SLMPD police officers prior Wright's arrest in August 2011.  Ex. U at 11-12, 17.  There is no evidence in the record that the Board was aware of misidentifications of arrestees and failed to address or tacitly authorized those acts.  Consequently, Wright's failure to supervise claim fails.  *See Liebe*, 157 F.3d at 579.

**V.     State law claims**

This Court should decline to exercise supplemental jurisdiction over Wright's supplemental state law claim against Wismar for false arrest and

false imprisonment. Under 28 U.S.C. § 1367(c)(3), this Court may decline to exercise supplemental jurisdiction over state claims if this Court has "dismissed all claims over which it has original jurisdiction." If this Court grants summary judgment in favor of Wismar on the § 1983 claim, then Wright's remaining state claim against Wismar should be dismissed as well.

Wright's state law claim fails on the merits as he cannot prove the necessary elements of false arrest and false imprisonment[4] because the undisputed facts demonstrate that Wismar had probable cause to arrest Wright. False imprisonment occurs where a person is confined by another person without legal justification. *Warrem v. Parrish*, 436 S.W.2d 670, 672 (Mo. banc 1969). Justification is a complete defense to a claim of false imprisonment. *Rustici v. Weidemeyer*, 673 S.W.2d 762, 767 (Mo. banc 1984). An arrest of an individual is justified if the arrest is made by an officer empowered to do so and that officer has a reasonable belief that the individual has committed the crime for which he is arrested. *Id.* at 769. A plaintiff may only prevail on this claim by demonstrating that the officer did

---

[4] The elements of a false arrest claim and false imprisonment claim are identical under Missouri law. *Rustici v. Weidemeyer*, 673 S.W.2d 762, 767 (Mo. 1984).

not have probable cause to make the arrest.[5]   *Taylor v. Isom*, No. 4:11CV1351CAS, 2013 WL 1867106, at *8 (E.D. Mo. May 2, 2013).

As discussed in Section III, Wismar had probable cause to arrest Wright for petty larceny.  *See* Ex. C at 95-97.  Regardless of whether or not Wright was booked on the outstanding warrants, Wismar testified that Wright would have been booked on the petty larceny charge and transported to the City Justice Center as it is his general practice to book arrestees for non-traffic related city ordinance violations.  Ex. C at 32-34.  Wright cannot dispute this probable cause due to his admission that he stole beer from the gas station.  Ex. D at 63.  Consequently, Wismar's arrest of Wright was justified.  *See Rustici*, 673 S.W.2d at 769.

Furthermore, Wismar is protected by official immunity and the public duty doctrine.  Under the doctrine of official immunity, a public employee will not be held liable for negligent acts committed during the performance of their discretionary duties.  *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008).  A discretionary function is one that involves the use of "reason in the adaptation of means to an end and discretion in determining how or whether the action should be done."  *Rustici*, 673 S.W.2d at 769 (Mo. banc 1984).  An officer's decision to stop or arrest an individual is a

---

[5] Wright's allegations in paragraph 132 of the Complaint related to his booking and events that occurred after the arrest are not actionable under a false arrest claim.  *See Taylor*, 2013 WL 1867106, at *8.

discretionary act recognized under Missouri law.  *Taylor*, 2013 WL 1867106 at *9.

The public duty doctrine holds that public officials are not liable in tort for injuries or damages sustained by individuals that result from a breach of a duty, even if it is a ministerial duty, that the official owes to the general public. *Jungerman v. City of Raytown*, 925 S.W.2d 202, 205 (Mo. banc 1996), *abrogated on other grounds by Southers v. City of Farmington*, 263 S.W.3d 603 (Mo. banc 2008).  Where the public official only has a duty to the general public, the official cannot be liable to the individual injured for the negligent performance of his public duty because no specific duty was owed to the individual. *Brown v. Tate*, 888 S.W.2d 413, 416 (Mo. App. 1994).  Police officers owe a duty to the public to keep the peace and enforce laws; a breach of these duties is not actionable by an individual citizen. *Beaver v. Gosney*, 825 S.W.2d 870, 873 (Mo. App. 1992).  Accordingly, no individual duty was owed to Wright.  Consequently, Wismar is entitled to summary judgment on Count IV.

## VI.    Conclusion

Defendants Slay, Irwin, Battle-Turner, Gray, Isom, Leyshock, and Wismar's motion for summary judgment should therefore be granted.

Respectfully submitted,

**CHRIS KOSTER**
Attorney General

/s/ *Karin A. Schute*
Karin A. Schute, #62019MO
Chris R. Hoell, #54011MO
Assistant Attorneys General
Missouri Attorney General's Office
P.O. Box 861
St. Louis, Missouri  63188
Phone:  (314) 340-7861
Fax:  (314) 340-7029
*Attorneys for Defendants Slay,*
*Irwin, Battle-Turner, Gray, Isom,*
*Leyshock, and Wismar*

## CERTIFICATE OF SERVICE

I certify that on this 16 day of September, 2013, I electronically filed the foregoing with the clerk of this Court by using the CM/ECF system, to be served by operation of the Court's electronic filing system, to the following:

Mr. James O. Hacking, III
Ms. Jennifer Shoulberg
Hacking Law Practice, LLC
34 N. Gore, Suite 101
St. Louis, Missouri 63119
*Attorneys for Plaintiff*

Mr. Daniel J. Emerson
City Counselor's Office
Room 314, City Hall
St. Louis, MO 63103
*Attorney for Defendants St. Louis City Sheriff's Department, Sheriff*
*Murphy, St. Louis City Division of Corrections, and Bryson*

/s/ *Karin A. Schute*
Assistant Attorney General