IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CEDRIC M. WRIGHT,              )
                              )
            Plaintiff,         )
                              )
vs.                           )   No. 4:12-CV-00107 AGF
                              )
ST. LOUIS BOARD OF            )
POLICE COMMISSIONERS,         )
et al,                        )
                              )
            Defendants.        )


Deposition of CEDRIC M. WRIGHT
taken on behalf of the Defendants
July 25, 2013


INDEX

Questions By:                        Page:
MR. EMERSON                          6, 189
MS. SCHUTE                      128, 189
MR. HACKING                           187


Reporter:   Sara Alice Masuga, CSR, CCR
            No. 084-002993


MASUGA COURT REPORTING
2033 HIAWATHA AVENUE
ST. LOUIS, MO  63143-1215

EXHIBIT

A

Page 1

1  application for that?

2       A.   I went to the office on Chouteau and

3  filled out the application and talked to my

4  counselor.

5       Q.   Do you remember when you did that?  Was

6  it before or after the August -- October of 2011?

7       A.   That was before.

8       Q.   Okay.  And have you had those

9  continuously since you applied?

10       A.   Yes.

11       Q.   Do you know how -- Was it -- Would it

12  have been, like, after you got laid off at Brown

13  Bedding, is that when you applied?

14       A.   No, it was -- it was, like, last year,

15  like in June, somewhere in there.

16       Q.   Okay.  So, around June of 2012 you think

17  you applied?  And I don't mean to confuse you.  If

18  you want to think about it.

19       A.   Yes, it's, like, two thousand -- yeah --

20  twelve 'cause --

21       Q.   Okay.  So, you weren't getting the food

22  stamps before you got arrested in August of 2011?

23       A.   Oh, yes, yes, I was getting them then,

24  but you only do it once and then it go up to a year,

25  so --

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1        Q.    So, you reapply every year?

2        A.    Yeah, every year.

3        Q.    Okay.  Do you know about how many years

4   you've been receiving the food stamp benefits?

5        A.    About two years, three years.

6        Q.    Okay.  Do you remember how much you were

7   making either per hour or what your salary was at

8   Brown Bedding?

9        A.    I would say, like, 200 a week.

10       Q.    $200 a week?

11       A.    Something like that, yes.

12       Q.    And how many hours would you work in an

13  average week for Brown Bedding?

14       A.    Like four, four hours.  He paid cash.

15       Q.    I gotcha.  And what did you do at Brown

16  Bedding?

17       A.    Load trucks and unload trucks.

18       Q.    And at the end of the week, he'd just

19  give you cash?

20       A.    Yes.

21       Q.    Okay.  What would you estimate is the

22  most money you've ever made in, like, a calendar year

23  from your employment or whatever sources of income

24  you have?

25       A.    The most money I ever made was on the

1    President Casino.  That was in '94 to '98.

2         Q.    You worked at the President Casino?

3         A.    Yes.

4         Q.    Okay.  What were you doing there?

5         A.    Porter.  I was a porter, housekeeper.

6         Q.    Okay.  Do you remember how much you were

7    paid then?

8         A.    I think, like, $9 an hour.

9         Q.    Okay.  And when you worked there, was it,

10   like, a 40-hour work week?

11        A.    Yes.

12        Q.    And did you work pretty much every week

13   of the year?

14        A.    Yes.

15        Q.    Okay.  And I apologize.  You said about

16   $9 an hour, give or take?

17        A.    Yes.

18        Q.    Okay.  Have you ever made more than $10

19   per hour doing any of the jobs you ever worked?

20        A.    No.

21        Q.    Okay.  And what is -- was -- your job at

22   the President Casino, you said it was about four

23   years, '94 to '98?

24        A.    Yes.

25        Q.    Is that the longest term you've held a

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1      A.   No, she just paid the lawyer, then he --
2  he came and got me.
3      Q.   After the four months?
4      A.   Yes.
5      Q.   Okay.  So, your trial didn't happen --
6      A.   No.
7      Q.   -- four months after that?
8      A.   Right.
9      Q.   But you spent four months in jail, there
10 was another period of time, then there was your
11 trial?
12     A.   Yes.
13     Q.   Okay.  All right.  And aside from that
14 stint and the 62 days in 2011, you've never been
15 locked up?
16     A.   No.
17     Q.   Okay.  Maybe overnight or something while
18 you were getting processed on the misdemeanor, but
19 nothing of any length over that, right?
20     A.   Right.
21     Q.   Okay.  Let's go ahead and talk about
22 August 20, 2011.  Were you arrested on August 20,
23 2011, in the city of St. Louis?
24     A.   Yes.
25     Q.   Okay.  And did that arrest involve the

Page 60

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1    petty larceny charge that may or may -- I have it
2    written down here as a conviction, but I don't know
3    if that's right or not, but when you were arrested on
4    August 20, 2011, were you arrested because you were
5    accused of stealing beer and some chips or whatever
6    from a convenience store?
7           A.   Yes.
8                  MR. HACKING:   Objection,
9           calls for speculation as to why he was
10          arrested.  He doesn't know why he was
11          arrested.
12          Q.   What was your understanding?  Why did you
13   think you were getting arrested?
14          A.   The beer.
15          Q.   Okay.  And my understanding of the facts
16   is that you went to one of the -- was it the 711
17   there at, like, Gravois and Jefferson and Sidney and
18   there was, like, six streets there?
19          A.   No, it was a filling station, Phillips
20   66.
21          Q.   Across the street?
22          A.   Yes.
23          Q.   Okay.  And do you understand that you
24   were accused of stealing beer and a bag of chips from
25   that?

MASUGA COURT REPORTING
314/680-2424

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1          A.   Yes.
2          Q.   Okay.   And where were you arrested that
3    day?
4          A.   At this park off of Jefferson.
5          Q.   Okay, the park near the convenience
6    store?
7          A.   Yes.
8          Q.   And were you drinking the beer at the
9    time?
10         A.   No.
11         Q.   Were you drinking some beer either prior
12   to that or?
13         A.   Well, before.  Before then --
14         Q.   Okay.
15         A.   -- yes.
16         Q.   When did you start drinking that day?
17         A.   Started around about, like, 12.
18         Q.   Okay.  And if the timeline is correct,
19   you had made earlier in the week or the week before
20   had a pretty good indication you were getting a job
21   at Goodwill?
22         A.   Yes.
23         Q.   Okay.  And then what -- was there any
24   particular reason why you were drinking on that date
25   or just felt like having a few beers?

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1       A.   Just felt like having a few beers.

2       Q.   Okay.  Was Mr. Brown with you?

3       A.   No.

4       Q.   Were you alone?

5       A.   No.

6       Q.   Who were you with?

7       A.   I was with a group of guys.  You know,

8  we -- You know, that -- that's where they come sit

9  and drink and barbecue and just listen to music.

10      Q.   Okay.  Were these, like, friends of yours

11 or just some people you kind of knew from that area?

12      A.   People I knew.

13      Q.   Okay.  And you were drinking and

14 barbecuing and listening to music?

15      A.   Yes.

16      Q.   At some point, did you run out of beer?

17      A.   Yes.

18      Q.   Is that when you decided to go to the

19 convenience store?

20      A.   Yes.

21      Q.   Okay.  One way or another, the case is

22 closed.  Did you steal beer that day?

23      A.   Yes.

24      Q.   Okay.  And you went back to the group,

25 right?

Page  63

1    going over to court?

2         A.    I had -- I had an orange jumpsuit on.

3         Q.    Okay.  And I presume anyone else who was

4    going over with you that wasn't a sheriff also had

5    that matching orange jumpsuit?

6         A.    Yes.

7         Q.    All right.  And do you know, did you go

8    over the catwalk or sky bridge that goes from the

9    Justice Center over to the Carnahan Courthouse?

10        A.    Yes.

11        Q.    And was a sheriff escorting you?

12        A.    Yes.

13        Q.    Okay.  Do you remember how many sheriffs

14   were escorting you to court?

15        A.    I think it was two.

16        Q.    Two?  All right.  Do you remember what

17   the sheriffs looked like?

18        A.    No.

19        Q.    Okay.  On your way to court, were you

20   asking questions of the sheriff?

21        A.    No.

22        Q.    Okay.  So, if I understand this

23   correctly, on your way to court on that Monday

24   morning, you were just kind of doing as you were

25   told, for lack of a better term?

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1      A.   Yes.

2      Q.   All right.  And how many courtrooms did

3  you go to that day?

4      A.   Just one.

5      Q.   Just one, all right.  Tell me about what

6  happened when you got to that courtroom.

7      A.   When I got in the courtroom, I sit down

8  and the judge, she was reading people's names and --

9      Q.   When she would read their name, would

10 they stand up and go talk to the judge?

11     A.   No, we would sit like where the jury sit

12 at --

13     Q.   Right.

14     A.   -- behind the little --

15     Q.   I know what you're talking about.

16     A.   Yeah.  No, we'll just stand and just look

17 at her.

18     Q.   Just so she knew that there was a body to

19 match that -- that case at that point?

20     A.   Yes.

21     Q.   All right.  At some point -- At some

22 point, did you get a chance to talk with the judge?

23     A.   Yes.

24     Q.   Okay.  And did you have a lawyer in the

25 courtroom that day that was there on your behalf like

Page 77

1   convinced Judge Hogan that you weren't Corey Leonard.
2   Does that refresh your memory of what happened that
3   day in court?
4          A.   Yes.
5          Q.   Okay.  Probably felt good, right, okay,
6   this one case is, you know -- they're -- Did you
7   think that the thing was getting resolved?
8                     MR. HACKING:  I'm going to
9              object to the form and also misstates
10             his testimony.  He didn't know whether
11             it was one case or not at the time.
12                    MR. EMERSON:  I just
13             refreshed his recollection.  He said he
14             did.
15                    (Questions by Mr. Emerson)
16         Q.   Anyway, what was your understanding after
17  you left Judge Hogan's courtroom?  Did you think you
18  were free -- that you were going to be getting out of
19  jail?
20         A.   I thought I was.
21         Q.   Okay.  All right.  What happened after
22  you left Judge Hogan's courtroom?  I presume, did you
23  go straight back to the jail?  You know, did the
24  sheriff take you back to the jail or did you have to
25  go wait somewhere?

Page 81

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1          A.    Went straight back to the jail.

2          Q.    Okay.  With the -- With the sheriffs?

3          A.    Yeah.

4          Q.    Were you asking -- or -- Were you asking

5    the sheriffs about what was going on at that point

6    since you had now been to court and some things had

7    happened at least on one of the cases?

8          A.    No.

9          Q.    Okay.  So, I think we've established when

10   you were going to court that morning, you didn't talk

11   to the sheriffs?

12         A.    No.

13         Q.    Short of them probably asking you your

14   name and you saying your name was Cedric Wright?

15         A.    Yes.

16         Q.    Okay.  Same thing on the way back?

17         A.    Yes.

18         Q.    All right.  At -- At some point when the

19   sheriffs take you back, you go across that bridge

20   again, you're back in the jail, they give you back to

21   the jail; correct?

22         A.    Yes.

23         Q.    Okay.  And did they give or do you -- did

24   you hold onto that piece of paper from the court that

25   day or did the sheriff have it?

Page 82

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1   misdemeanor.

2         Q.   The misdemeanor of Corey Leonard's, not

3   the beer charge that you had, right?

4         A.   Well, I'm thinking the beer charge.

5         Q.   Okay.  All right.  At some point you

6   realized that wasn't the case, though, right?

7         A.   Right.

8         Q.   Okay.  Now, when you get back from court,

9   did you have a conversation with any other CO's, you

10  know, asking about your case, asking them to look up

11  charges, things of that nature?

12        A.   Well, when I got back from court,

13  that's -- that's when I seen the dark-skinned guy,

14  the sheriff, and, so, I asked him what I'm being

15  charged with and --

16        Q.   Okay, let me stop you.  And you may have

17  been confused, so I just want to clear this up.  On

18  your way back from court with the sheriffs, you had

19  earlier testified that you didn't talk to them.  It

20  sounds like did you maybe have a conversation with a

21  black sheriff?

22        A.   Yes.

23        Q.   Okay.  Asking about your charges?

24        A.   Yes.

25        Q.   Do you remember how that conver- -- you

Page 85

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1    know, what happened during the conversation?

2         A.    Well, when I got -- got out the cell and,

3    so, I just walked up to him and I asked him, you

4    know, what I'm being charged with and that's when he

5    say, you know, I have a felony warrant.

6         Q.    Okay.  So, you had the two felony -- your

7    understanding when you got back from the court based

8    on what the sheriff told you is you still have two

9    felony cases that a judge needs to do something on,

10   basically?

11        A.    Well, me and him, you know, didn't pretty

12   much talk 'cause he was kind of being mean about it,

13   but he said I have a felony warrant.

14        Q.    Okay.  And that's why you weren't going

15   to be able to go home?

16        A.    Right.

17        Q.    That was your understanding?

18        A.    Yes.

19        Q.    All right.  Did you have any other

20   conversations with the black sheriff or anybody else

21   in a brown sheriffs' uniform?

22        A.    No.

23        Q.    All right.  So, you come back now,

24   you're -- you're downtown for about a week before

25   you're going out to the Workhouse; correct?

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1        A.    Yes.

2        Q.    All right.  Did you go back to the same

3   pod where you had been before you went to court?

4        A.    No.

5        Q.    Okay.  Did you go to a different pod?

6        A.    Actually I didn't go to no pod.  They put

7   me in, like, a little cell, you know, with other

8   guys.

9        Q.    Was it your understanding you were just

10  being held there until they were going to take you up

11  to Hall Street?

12       A.    Yes.

13       Q.    Is that what happened?

14       A.    Yes.

15       Q.    Did you have an opportunity to talk to

16  anybody like the corrections officers, CO's, anyone

17  like that, did you talk to anybody, like, you know,

18  before you went out to the Workhouse?

19       A.    No.

20       Q.    Okay.  At some point, and I will

21  represent to you it would have been on August 24,

22  which would have been, I guess, the Wednesday, so you

23  would have been downtown for two days and then,

24  according to your jail file, you went out to --

25            MR. HACKING:  Two days after

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1        court?

2           Q.    Two days after court.  So, you went to

3    court on a Monday.  That Wednesday at -- I hate

4    military time -- 6:38 -- No, I'm sorry.  That

5    Wednesday at 6:54 --

6                       MR. HACKING:  Did it break?

7                       (At this point, there was

8                        a short interruption.)

9           Q.    Do you dispute -- I mean, the jail record

10   says you got transferred on a Wednesday at 6:50, so

11   it would have been, like, a Wednesday night you would

12   have got to the Workhouse on Hall Street; does that

13   sound about right?

14          A.    Yes.

15          Q.    Okay.  And when you got to the Workhouse

16   on Hall Street, did they do some sort of, like, and

17   intake with you and probably everybody else that was

18   in the van?  Did they check to make sure your name,

19   you know --

20          A.    Yes.  Well, yes.

21          Q.    -- to make sure all the paperwork

22   matched?

23          A.    Yes.

24          Q.    All right.  And did you -- Take me

25   through the process when you're at the Workhouse

Page 88

1    there.  I presume it's not like you come in, they

2    say -- Well, let me ask you this:  They say you're

3    Cedric Wright, your armband says Cedric Wright, you

4    stay over there, or do you meet with people before

5    you actually are assigned to where you're going to

6    be?

7           A.   Well, once we, you know, first pass the

8    gates, come around to the back, we come around to the

9    back, pass the gates, once we get in, they tell us to

10   stand by the wall and they call out your name, you

11   know, make sure it's the right person and --

12          Q.   And when they were calling out your name,

13   they were calling out Cedric Wright --

14          A.   Yes.

15          Q.   -- were they?  Okay.  Go on.

16          A.   And, so, stood by the wall and had to

17   wait for your name to be called to get processed in

18   the computer and, so -- so, after we got processed,

19   on the left-hand side, it was, like, three or four

20   cells, so they had letters, they called by letters,

21   so then that's when they told each individual to go

22   to that cell, you know what I'm saying, it might be

23   H, O, B, you know -- you know, to go to that cell.

24          Q.   I followed.  Did -- Were you offered a

25   chance to make a phone call and did you give

```
 1    information, which I presume you may have given,

 2    like, your sister or someone, your outside contact

 3    information, do you remember having to go through

 4    that --

 5         A.   Yes.

 6         Q.   -- exercise?  If I say you had a

 7    caseworker, does a caseworker at MSI, does that sound

 8    familiar?  Does that mean anything to you?

 9         A.   Yes, I had a caseworker.

10         Q.   Okay.  Miss Portwood?

11         A.   I can't remember her name.

12         Q.   Okay, but you did have a caseworker?

13         A.   Yes.

14         Q.   And is that who you met with during the

15    initial intake at some point?

16         A.   Yes.

17         Q.   Okay.  It looks like you would have met

18    with her kind of late, at about eleven o'clock that

19    night --

20         A.   Yes.

21         Q.   -- when you were first there?

22         A.   Yes.

23         Q.   Okay.  She indicated that you were given

24    a phone call and it says contact made, whatever that

25    means.  Do you remember that and she asked you if you
```

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1    wanted to make a phone call?

2         A.   Yes.

3         Q.   Did you make a phone call?

4         A.   Yes.

5         Q.   Okay.  Who did you call?

6         A.   My sister.

7         Q.   And did you actually get in touch with

8    your sister?

9         A.   Yes.

10        Q.   Okay.  What did you tell your sister?

11        A.   Well, I told her they locked me up and

12   I'm down at the Workhouse.

13        Q.   Okay.  Did you tell her anything about

14   these aren't my charges or anything of that nature or

15   was it just a short phone call, Hey, this is where I

16   am, you're not going to see me for a while?

17        A.   Well, I had mentioned that to her that

18   they, you know, saying that, you know, I had felony

19   charges, which she knew that I didn't --

20        Q.   Okay.

21        A.   -- but, you know, I told her that.

22        Q.   Did you ask her to contact Mr. Zotos or

23   any lawyers or anything for you or?

24        A.   Well, she tried, but, you know, and, no,

25   she ain't have no money to get a lawyer or nothing,

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

```
 1   so couldn't get no lawyer.
 2          Q.   At any time -- And I understand in
 3   October you wrote a letter to Mary Fox, who is a
 4   public defender?
 5          A.   Yes.
 6          Q.   Before that, had -- had you or anyone on
 7   your behalf made an opportunity to either get you a
 8   lawyer or to get you an appointment with, like, a
 9   public defender?
10          A.   Well, they denied me of the public
11   defender, but I never did see no lawyer.
12          Q.   Okay.  And let's go -- And what did you
13   say?  Did you ask for a public defender when you
14   talked to the judge the first time that Monday?
15          A.   No, no.  What -- What happened as far as
16   it's like on a -- it's like a Wednesday or a Friday,
17   you know, the CEO's (sic) come around and hand you a
18   sheet, a piece of paper as far as about the public
19   defenders, so -- so when I filled mine's out and when
20   it came back, they -- they say that I was denied.
21          Q.   Oh, so, you didn't qualify for a public
22   defender?
23          A.   Right.
24          Q.   Okay.  All right.  When did you get to
25   fill out that sheet, when you were downtown or when
```

1    you were on Hall Street?

2          A.    On Hall Street.

3          Q.    Okay.  All right.  Do you know, was

4    that -- I guess we're jumping around a little bit.

5    You talked to the caseworker?

6          A.    Yes.

7          Q.    Okay.  And did you tell the -- When did

8    you make the phone call to your sister, was it after

9    you met with the caseworker or while you were meeting

10   with her?  I mean, did she have a phone on her desk

11   and said you could make a phone call?

12         A.    Yeah, she had a phone on her desk.  While

13   I was with her.

14         Q.    Okay.  And then did you explain to the

15   caseworker what you thought was going on?

16         A.    I really didn't talk to her.

17         Q.    Okay.

18         A.    'Cause, you know, I just got my shot and

19   made the phone call, talked to my sister, then after

20   that, went back.  I left.

21         Q.    What do you mean, you have your

22   opportunity to talk to her or she, like, gave you a

23   shot or something?

24         A.    Well, a TB shot.

25         Q.    Oh, the medical people were?

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

```
 1          A.    Yeah.
 2          Q.    Okay.  All right.  So, you talked to the
 3    caseworker, you make your phone call, and at that
 4    point, MSI doesn't have pods, they have dorms, right?
 5    The big rooms?
 6          A.    Well, it was overcrowded, so --
 7          Q.    We'll get to that, but you were assigned
 8    a place to -- a bed or I know they have those boats
 9    with the mattresses in them, you were assigned
10    someplace that was going to be your place to sleep, I
11    presume?
12          A.    At first I went to the pod before I went
13    to the dorm soon as I got there at the Workhouse.
14          Q.    You were in a -- an area for the intake
15    with a caseworker; correct?
16          A.    Yes.
17          Q.    Then you moved to an area called a pod?
18          A.    Yeah, I went to the pod first before I
19    went to B and O.
20          Q.    Okay.  How long were you in that pod
21    area?  Was it hours or days or?
22          A.    It was days.  It was almost, like, two
23    weeks.
24          Q.    Okay.  And was that similar to like a pod
25    at the Justice Center where there's a cell or many
```

Page 94

```
 1    cells within a contained unit?
 2         A.   Yes.
 3         Q.   Okay.  And you were in -- were you in
 4    that cell by yourself?
 5         A.   No, with another guy.
 6         Q.   Okay.  Was it a 2-man cell, two beds?
 7         A.   Yes.
 8         Q.   And that picture that's like a sink and a
 9    toilet all in one, one of those deals?
10         A.   Yes.
11         Q.   Okay.  And you stayed there for about two
12    weeks?
13         A.   Yes.
14         Q.   Did -- During that two weeks, were you
15    asking any CO's or your caseworker to figure out what
16    was going on with these felony cases that weren't
17    yours or that you were telling people -- Well, did
18    you talk to anybody?
19         A.   No.
20         Q.   Okay.  Did you try to talk to anybody?
21         A.   No, because I was on lockdown 23 hours.
22         Q.   And I understand that, but did you -- I
23    presume somebody still comes by and checks on you
24    periodically?
25         A.   Yes.  Yes, but I ain't talk to nobody
```

Page 95

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

```
 1    down --
 2          Q.   Okay.
 3          A.   -- at the Justice Center --
 4          Q.   But --
 5          A.   -- I mean, the Workhouse.
 6          Q.   And I understand you're in lockdown, but
 7    did you make an attempt to talk to anybody during
 8    that 2-week period in the pod at the Workhouse?
 9          A.   No.
10          Q.   Okay.  Did you have any idea when or if
11    you had another court date?
12          A.   No.
13          Q.   Okay.  And aside from that initial phone
14    call you made to your sister, did you make any other
15    phone calls while you were at MSI?
16          A.   No.
17          Q.   Okay.  Did you ever try and make phone
18    calls?
19          A.   I tried.
20          Q.   And tell me about that.
21          A.   Well, since I didn't have no money on my
22    books, so my calls, you know, never did go through.
23          Q.   So, you would, like, make a collect phone
24    call?
25          A.   Yes.
```

MASUGA COURT REPORTING
314/680-2424

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1      Q.   Okay.  So, you had -- So, you would try
2   to make a call?  You could actually use the phone,
3   but you weren't successful in connecting with
4   whomever you were trying to call?
5      A.   Yes.
6      Q.   Because they wouldn't accept the charges
7   or they weren't home or --
8      A.   Yes.
9      Q.   Okay.  Do you know how many times you
10  tried to make a phone call?
11     A.   Over five times.
12     Q.   Okay.  Was it the same result every time,
13  you couldn't get in touch with anyone?
14     A.   Yes.
15     Q.   Were you always trying to call your
16  sister?
17     A.   Yes.
18     Q.   Okay.  And at some point, did you just
19  get frustrated that you couldn't get in touch with
20  her and you stopped making phone calls?
21     A.   Yes, so, that's when I decided to write
22  letters.
23     Q.   Okay.  Did anyone from -- Did any CO's
24  tell you, No, Cedric, you don't get to make a phone
25  call, you don't even get to try to make a phone call?

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

```
 1          A.    Yes.
 2          Q.    Okay.  Is one of them in the dorms, is
 3    it, like, a direct line to the public defender's
 4    office or is there something like a sign with the
 5    public defender?  Does that ring a bell?
 6          A.    It's a -- Well, they had a sheet of paper
 7    up there.
 8          Q.    With the information?
 9          A.    Yes, to -- to call the public defenders,
10    but --
11          Q.    Okay.
12          A.    -- you know, like I say, I got denied.
13          Q.    And based on that denial, did you ever
14    try and call the public defenders in spite of that to
15    say, Hey, take another look, I don't have any money,
16    anything like that?
17          A.    Well, I tried, but they denied me, so
18    that's when I sat down and started writing letters.
19          Q.    Okay.  All right.  So, it sounds like you
20    made approximately or you tried to make approximately
21    five calls to your sister but couldn't get in touch
22    with her?
23          A.    Right.
24          Q.    And then did you try to make phone calls
25    to the public defender's office?
```

Page 99

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1       A.   Yes, I tried.

2       Q.   Okay.  Did you actually get in touch with

3  someone there and they said no or was it another one

4  of those deals where nobody answered the phone or?

5       A.   Well, I recall one time I got through --

6  Well, you know, I tried to talk to somebody, but I

7  didn't get no -- didn't get no response, you know, so

8  I just stopped calling.

9       Q.   Sure.  Do you know about how many times

10  you tried to call the public defender's office?

11      A.   Seems about like over five times --

12      Q.   Okay.

13      A.   -- but I think I got through once.

14      Q.   All right.  Do you know, did you talk to

15  a lawyer or did you just talk to somebody -- or did

16  you even know who was on the other line, just

17  somebody from the office?

18      A.   I didn't know.

19      Q.   What did you tell -- The one time you

20  actually got to talk to somebody, do you remember

21  what you told them?

22      A.   I can't recall.  I can't remember, it's

23  been so long.

24      Q.   I understand.  Do you think it was

25  probably about your cases?  And what I mean by "your

1    cases," the two felony warrants for Corey Leonard.

2                      MR. HACKING:   Object to the

3        form.

4        A.   Well, I was -- I was trying to talk to

5    somebody, well, yeah, about the case and --

6        Q.   'Cause you just wanted to know what was

7    going on?

8        A.   Yeah, what was going on, yeah, basically

9    and --

10       Q.   And you couldn't get a straight answer

11   from the public defender?

12       A.   I couldn't get a straight answer, right.

13       Q.   All right.  When you got to the dorm part

14   of the Workhouse, is that where you spent the vast

15   majority of those 62 days, probably all but maybe two

16   weeks of your -- your stint?

17       A.   Yes.

18       Q.   Okay.  What's the dynamic there?  And

19   what I mean by that, I know you're not in a cell.

20   It's a big open area, right?

21       A.   Yes.

22       Q.   Okay.  And there's beds?

23       A.   Yes.

24       Q.   Does it almost look like an Army barracks

25   type of deal?

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1          A.    Yes.
2          Q.    Okay.  And how do the CO's patrol the
3    area?  Are there CO's that just kind of walk about?
4    Are they stationed?
5          A.    It's, like -- It's, like, 2 CEO's (sic)
6    in the hallway.  They -- They sit at their desk.
7          Q.    Right.
8          A.    Like there be one on one end, there be
9    another on the other end and then they, you know,
10   look up and down.  Some of them sometimes they do
11   walk.
12         Q.    Sure.  And when you're in the dorm area,
13   that wasn't the lockdown like the pod area, right?
14         A.    Right.
15         Q.    What I mean is, you were free to move --
16         A.    Yes.
17         Q.    -- within that dorm area?
18         A.    Dorm, yes.
19         Q.    Okay.  You weren't, like, chained to a
20   bed or anything like that?
21         A.    No.
22         Q.    Okay.  And you said there were two pay
23   phones in the area?
24         A.    Yes.
25         Q.    And those were accessible to anyone who

Page 102

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

```
 1    was in that dorm?
 2         A.   Yes.
 3         Q.   Okay.  When do you think you stopped
 4    trying to contact people on the phone?  Was it --
 5    Were you still using the pay phones in the dorm area
 6    or at least trying?
 7         A.   Actually, I stopped when --
 8         Q.   Was it after that one time actually you
 9    talked to somebody in the public defender's office?
10         A.   Yeah, that's when I stopped.
11         Q.   Were you just frustrated?
12         A.   Yes.
13         Q.   Okay.  And do you think that would have
14    been within the first week or so that you were in the
15    dorm area?  I mean, were you, you know, trying every
16    day to call people and then you just stopped after
17    five days or was this something where you tried?
18         A.   I'd say after a week, I really stopped
19    trying.
20         Q.   Okay.
21         A.   That's when I started talking to the guys
22    in there and --
23         Q.   Now, when you say "the guys," are you
24    talking about your fellow inmates?
25         A.   Yes.
```

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

```
1            Q.    Okay.  And did you ever talk to any of
2     the CO's about what was going on after you had given
3     up on the calling your sister and you had given up on
4     the public defenders, did you talk to, you know,
5     somebody in a blue shirt, ask them for help or
6     anything like that?
7            A.    Yes.
8            Q.    Tell -- I need to know specifically what
9     happened --
10           A.    Well --
11           Q.    -- if it happened more than once.
12           A.    No, it just happened once.
13           Q.    When do you think it was?
14           A.    I'd say, like -- say, like -- like, a
15     month and a half after I -- after I was there and --
16           Q.    Do you think it might have been, like,
17     early October?
18           A.    No, it was, like, in, like, November.
19           Q.    Well, you weren't there in November.
20           A.    I mean --
21           Q.    August?  September?
22           A.    Yes, but --
23           Q.    I'm not trying to hang you up on the
24     dates.
25           A.    It was, like -- It was, like, seemed like
```

1  three weeks after I was there, you know.

2        Q.    Okay.  You talked to the CO?

3        A.    Yeah, after I tried to talk to the CO,

4  then I asked them, you know -- you know --

5        Q.    Let me stop you.  Do you remember the

6  name of the CO --

7        A.    No.

8        Q.    -- that you tried to talk to?

9        A.    No.

10        Q.    Do you remember anything about that CO's

11  appearance, such as was it a man or a woman?  Were

12  they black or white?  Tall?  Short?

13        A.    It was a woman.  She was black.

14        Q.    Black woman?

15        A.    Yes.

16        Q.    Okay.  Would you recognize her if you saw

17  her out on the street?

18        A.    Probably not, no.

19        Q.    Okay.  What do you recall about your

20  conversation with her?

21        A.    When I first approached her, I gave her

22  my name.  I told her my name was Cedric Wright and --

23        Q.    Was she sitting at, like, a place with a

24  computer where she could look up stuff?

25        A.    No, she had a sheet of paper with just

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

```
 1    stuff -- stuff write down on paper.
 2         Q.   Okay.
 3         A.   And, you know, when she would look
 4    through the paper and, you know, saw my name,
 5    Cedric Wright, you know what I'm saying, and then,
 6    you know, she had said that, you know, I ain't
 7    supposed to be here, you know, in the Workhouse
 8    and --
 9         Q.   Because it was Corey Leonard's warrants?
10         A.   Yes.
11         Q.   Okay.  Did you ever explain to her this
12    whole mixup that was going on?
13         A.   I didn't talk to her that long, but she
14    told me that I ain't supposed to be there, so I took
15    it ass -- you know, asking for myself to -- that's
16    why I, you know, like I say, talk to the inmates and
17    then I went on and sit down and wrote -- that's when
18    I found out about Mary Fox was.  That's when I wrote
19    her then.
20         Q.   She's got to take down everything you're
21    saying.
22         A.   Okay.
23         Q.   I -- I've been practicing law for nine
24    years.  I still talk too fast.  I sometimes jumble my
25    words.  It's just something you've got to kind of
```

1    slow it down.

2            A.    Okay.

3            Q.    Did you ask that female CO about, like, a

4    court date or anything like that for you?

5            A.    No.

6            Q.    Okay.  Did -- Did you ask that CO to

7    contact a lawyer for you?

8            A.    No.

9            Q.    Did you ever ask anyone at Corrections to

10   see your caseworker?

11           A.    No.

12           Q.    Okay.  Did anyone -- Did you have any

13   visitors come out to the Workhouse when you were

14   there?

15           A.    My sister and my lady, she came, Adrian.

16           Q.    Right.

17           A.    Oh, I know her last name.  I remember.

18   Her last name was Smallwood.

19           Q.    Smallwood?

20           A.    Yes.

21           Q.    Okay.  So, Sharon is your sister's name,

22   right?

23           A.    Yes.

24           Q.    So, Sharon and Adrian came to visit you?

25           A.    Yes.

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1    sister trying to stay in touch with her and, you

2    know, she was horrible at writing me back, so

3    that's -- that was my contact right there.

4         Q.    Okay.

5         A.    And then --

6         Q.    Now, it looks like the -- And I want to

7    check this with you.  My records indicate you would

8    have sent one letter to Mary Fox and it was dated

9    October 16 of 2011.  Do you -- Do you -- Do you think

10   you sent more than one letter to Mary Fox or do you

11   think it was just that one?

12        A.    Just that one.

13        Q.    Okay.  And what -- you handwrote that

14   letter, I presume?

15        A.    Yes.

16        Q.    Okay.  And what -- briefly, tell me what

17   was in that letter to Mary Fox.  You just explain

18   your situation?

19        A.    Yes, I was telling about -- What was it?

20   Well, I pretty much remember this.  I had asked her,

21   you know, to check into my case and can you find out

22   what's going on and -- and -- and tell me what's

23   going on as far as, you know --

24        Q.    Okay.

25        A.    -- about my case.

Page 111

```
 1          Q.   And does that sound about right to you,
 2   you would have sent that letter on October 16?
 3          A.   That sound about right.
 4          Q.   Okay.  You were released on October 20;
 5   correct?
 6          A.   Yes.
 7          Q.   Okay.  Aside from what we've discussed
 8   about your sister trying to get a lawyer and you, you
 9   know, unsuccessfully making phone calls to the public
10   defender's office, had you made any other attempts to
11   contact a lawyer?
12          A.   No.
13          Q.   Okay.  In terms of visitors, were you
14   ever denied access to visitors by anyone from the
15   jail staff?
16          A.   No.
17          Q.   Okay.  What about anybody from the
18   sheriff's staff?
19          A.   No.
20          Q.   Okay.  Were you ever denied access to the
21   telephone by any jail staff?
22          A.   No.
23          Q.   What about any sheriff staff?
24          A.   No.
25          Q.   Okay.  And it sounds like you were
```

```
 1   writing letters -- you wrote the one letter to

 2   Mary Fox?

 3          A.   Yes.

 4          Q.   And several letters to your sister?

 5          A.   Yes.

 6          Q.   As far as you know, did your sister get

 7   all those letters?

 8          A.   Yes.

 9          Q.   And I think it's pretty obvious Mary Fox

10   got the letter?

11          A.   Yes.

12          Q.   Did anyone ever deny you mail service,

13   either sending out your mail or letting you get your

14   mail, did any jail staff deny that to you?

15          A.   No.

16          Q.   What about any sheriff staff?

17          A.   No.

18          Q.   Did -- Do you know who Charles Bryson is?

19          A.   I can't recall.

20          Q.   Okay.

21          A.   I don't know.

22          Q.   Do you know if when you were either at

23   the Justice Center or the Workhouse, did you ever

24   have any encounters with Charles Bryson?  Did you see

25   him?  Did you talk to him?  Did you send him a
```

Page 113

1   letter?

2        A.   No.

3        Q.   Okay.  What about Gene Stubblefield, did

4   you have any interaction with Gene at all?  And I'll

5   represent to you he was the superintendent at the

6   time, kind of a warden, for lack of a better term.

7        A.   No.

8        Q.   What about a gentleman named Eddie Roth?

9        A.   No.

10       Q.   What about Sheriff Jim Murphy?  He's an

11  elderly guy, gray hair, white guy.

12       A.   No.

13       Q.   Okay.  What about a gentleman named Mike

14  Guzy?  He's a tall, slim white guy with bald head --

15       A.   No.

16       Q.   -- moustache.  You had mentioned an

17  African American sheriff that took you back from

18  court that first date; correct?

19       A.   Yes.

20       Q.   Okay.  If I said the name Benny Goins, do

21  you think that -- And Benny Goins is a sheriff.  It

22  looks like the records were that he transported you

23  on that date and he is black.  Do you know

24  Benny Goins?

25       A.   I can't recall by name, but I remember

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1    his face.
2         Q.    Okay, sure.  And that was the interaction
3    you had with the sheriff asking about the cases and
4    he said you had felony warrants still?
5         A.    Yes.
6         Q.    Okay.  What about a lady name in the
7    sheriff's office named Ruthann Alberti, did you ever
8    have any encounter with her?
9         A.    No.
10        Q.    All right.  You said you talked to other
11   inmates?
12        A.    Yes.
13        Q.    I'm sure you talked to them about a
14   number of things.  You guys were all locked up
15   together, right?
16        A.    Right.
17        Q.    And at some point, did you start asking,
18   Hey, what should I do?  I mean, were you just
19   reaching out for anyone who would help or what?
20        A.    Yes.
21        Q.    Okay.  It was another inmate that
22   suggested to you to write a letter to Mary Fox?
23        A.    Yes.
24        Q.    Okay.  Were you talking to these other
25   inmates?  Were you explaining to them what's going

Page 115

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

```
 1    on, that you have these felony cases that aren't
 2    yours and?
 3           A.   Yes, because it was -- it was another guy
 4    in there, too, that pretty much had the same cases I
 5    had, so that's --
 6           Q.   You mean like a similar situation?
 7           A.   Yeah, so that's where the conversation
 8    came about.
 9           Q.   Was he the one who told you to write a
10    letter to Mary Fox?
11           A.   No, I can't recall his name, but --
12           Q.   Do you remember the name of the guy that
13    was similarly situated to you?
14           A.   No.
15           Q.   Okay.
16           A.   I can't remember.
17           Q.   Do you remember what he looked like?
18           A.   Well, I know he -- he wore glasses and he
19    was bald head.
20           Q.   Wasn't me, was it?
21           A.   No.
22           Q.   I think we've discussed your interactions
23    with corrections officers, but I want to ask, 'cause
24    I don't want to miss anything, were there any
25    instances where we haven't discussed where you were
```

Page 116

1  telling jail staff, CO's, caseworkers, whomever that
2  you were not Corey Leonard?  Aside from you asking
3  about the cases, which I know we've already
4  discussed, but was there ever a time where you just
5  reached out to somebody, a corrections officer, and
6  said, I am not Corey Leonard?
7        A.   Well, to be honest with you, they knew
8  that because they kept calling me by Cedric and --
9        Q.   That's fair enough, but be that as it
10  may, you were still there on Corey's felony warrants?
11        A.   Yes.
12        Q.   And what I'm asking is, did you ever --
13        A.   No.
14        Q.   -- reach -- Okay, thank you.  What about
15  anyone -- What about anybody from the sheriff's
16  office?
17        A.   No.
18        Q.   Okay.  Aside from that initial intake
19  with Miss Portwood on August 24, did you ever speak
20  with your caseworker again?
21        A.   No.
22        Q.   Did anyone deny you access to your
23  caseworker if you had asked?
24        A.   No.
25        Q.   And "anyone," I mean any jail staff.

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

```
 1        A.   No.
 2                    MR. HACKING:   Calls for
 3        speculation.
 4        Q.   Did anyone deny you access to your
 5   caseworker?
 6        A.   No.
 7        Q.   Was it your understanding if you wanted
 8   to see a caseworker that you could?
 9        A.   I could, yeah.
10        Q.   Okay.  Did you ever fill out any -- Do
11   you know what an IRR is over at the Workhouse?  If
12   you had, like, a problem with a CO or an inmate, you
13   could fill out --
14        A.   Right.
15        Q.   Okay.
16        A.   No.
17        Q.   Did you know those existed, those forms,
18   that you could fill out a form if you had a grievance
19   or you wanted something resolved?
20        A.   No.  Actually not, no.
21        Q.   Okay.  You weren't aware of that?
22        A.   No.
23        Q.   All right.  Did you ever ask anybody, any
24   jail staff, if there was a form you could fill out or
25   some type of paperwork you could complete to, you
```

1  know, try and get this matter resolved?

2      A.   No.

3      Q.   All right.  Did any jail staff ever deny

4  you access to the -- what I call the grievance

5  process?

6      A.   No.

7      Q.   We're just about finished.  Famous last

8  words.  Your lawyer -- Your lawyers have provided

9  some names to me of some people and I just want to

10  see if you know them or their situation personally.

11  I just want to see that, okay?  So, I'm going to ask

12  you about less than ten people.  Do you know anyone

13  named Jeffrey A. Smith?

14      A.   No.

15      Q.   Do you know anyone named Eugene Hamilton?

16      A.   No.

17      Q.   Do you know a gentleman named Antonio M.

18  Johnson?

19      A.   No.

20      Q.   Do you know any Antonio Johnsons?

21      A.   No.

22      Q.   What about an Oliver C. Johnson?

23      A.   No.

24      Q.   Any Oliver Johnsons in general?

25      A.   No.

1    to the jail, actually to the courtroom, did you talk

2    to any Corrections staff, jail, you know, CO's or

3    whatnot about your case or about what was going on?

4            A.    No.

5            Q.    Okay.  What about any sheriff's deputies?

6            A.    No.

7            Q.    All right.  So, you get to court.  And is

8    it similar to the last time you were there, you go

9    into the jury box, you stand up when your name was

10   called, or was this different?  Were you the only

11   defendant in court?

12           A.    No, it was -- it was, like, two more

13   other people in there with me.

14           Q.    Okay.  And there were probably lawyers

15   and a bunch of other people in the courtroom?

16           A.    Yes.

17           Q.    Okay.  And did Mary come up to you or how

18   did that interaction happen?

19           A.    Yes, she came up to me.

20           Q.    Okay.  Said, Mr. Wright, I got your

21   letter?

22           A.    Yes, she -- she called my name.

23           Q.    Okay.

24           A.    And then she --

25           Q.    All right.

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1      A.   -- walked towards me --

2      Q.   All right.

3      A.   -- 'cause --

4      Q.   And did you explain to her everything

5  that had been going on?

6      A.   No, she -- she -- she -- she looked in my

7  papers.  No, I can't do that much talking in there,

8  so she had looked through my papers and told me

9  what's going on and then she went back to where the

10 judge was and got a form, she filled a form out and

11 hand it to the judge and --

12     Q.   Did you talk to the judge?

13     A.   I seen her, but I ain't talk to her, but

14 I seen her.

15     Q.   Okay.  She didn't bring you up and ask

16 you questions about --

17     A.   No.

18     Q.   -- are you Cedric Wright?

19     A.   No.

20     Q.   Okay.

21     A.   Once I sit down, I stayed in my seat.

22 That's --

23     Q.   I understand.

24     A.   -- as far as I can go.

25     Q.   I understand.

Page 125

1      A.   And -- But -- But when he called my name,

2  I stood up and, you know, that's when he say, you

3  know, you're free to go.

4      Q.   Okay.  And did -- did Miss Fox talk to

5  the judge on your behalf do you think?

6      A.   Yes.

7      Q.   Okay.  Did -- At any point when you were

8  locked up, did you ask anybody, any jail staff or any

9  sheriff staff to take your fingerprints or anything

10  like that to try and prove your identity?

11      A.   They took my fingerprints.

12      Q.   I understand that the police processed

13  you and took your fingerprints.  What I'm asking is

14  did you ask for them to compare yours to

15  Corey Leonard's or anything like that.

16      A.   No.

17      Q.   Okay.  Did -- Did you ever have to --

18  Aside from when you got processed, were you

19  fingerprinted again from somebody else at the police

20  department probably to check your prints against

21  Corey's?

22      A.   No.

23      Q.   Okay.  So, you're in court on October 20

24  in the afternoon?

25      A.   Yes.

Page 126

CEDRIC M. WRIGHT v. ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al
Deposition of CEDRIC M. WRIGHT taken on 07/25/2013

1      Q.    You get the order from the judge.  Did
2  Mary come and explain to you what's going on that you
3  were going to be released?
4      A.    Yes.
5      Q.    I'm sure that was quite a relief to you.
6      A.    Yes, it was.
7      Q.    But you weren't released yet, so you
8  probably thought, well, you know, I'll believe it
9  when I see it, right?
10     A.    Yes.
11     Q.    Okay.  So, did you have to go all the way
12  back to Hall Street to get released or were you
13  released from downtown?
14     A.    I was released from downtown.
15     Q.    Okay.  And they gave you all your
16  property back that you would have been taken in on?
17     A.    Yes.
18     Q.    All right.  I apologize.  I thought I had
19  covered everything, and then when I asked you, that's
20  when it reminded me that I hadn't.  That's why we
21  call it the practice of law.  We're just practicing.
22  Karin is going to talk to you or Miss Schute is going
23  to talk to you about the arrest, but in terms of your
24  62 days in -- in the Workhouse and CJC, is there
25  anything that I missed that you think is important

Page  127