1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CEDRIC M. WRIGHT,
Plaintiff,
vs.                         Cause No. 12-CV-107-AGF
FRANCIS SLAY,
Defendants.

VIDEOTAPED DEPOSITION of OFFICER ANDREW WISMAR
Taken on behalf of the Plaintiff
March 19, 2013

Reported by Victoria Menaugh Fauser
CCR No. 903
CSR Missouri and Illinois

MENAUGH FAUSER REPORTING
416 SOUTH WOODLAWN AVENUE
KIRKWOOD, MISSOURI  63122
OFFICE:  (314) 965-7162
FAX:  (314) 909-6631

---

3

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

James O. Hacking, III
Jennifer L. Shoulberg
Hacking Law Practice, LLC
34 North Gore - Suite 101
St. Louis, Missouri 63119
(314) 961-8200

FOR THE DEFENDANT ST. LOUIS CITY:

Daniel J. Emerson
St. Louis City Counselor
314 City Hall
St. Louis, Missouri 63103

FOR THE DEFENDANT SLMPD:

Karin A. Schute
Christopher Hoell
Attorney General of Missouri
P.O. Box 861
St. Louis, Missouri 63188

Also Present:  Cedric Wright
               Lou Stemmler, Videographer

---

2

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CEDRIC M. WRIGHT,
Plaintiff,
vs.                         Cause No. 12-CV-107-AGF
FRANCIS SLAY,
Defendants.

VIDEOTAPED DEPOSITION of OFFICER ANDREW WISMAR, produced, sworn, and examined on behalf of the Plaintiff, on March 19, 2013, between the hours of nine o'clock in the forenoon and five o'clock in the afternoon of that day at the Office of the Attorney General, 815 Olive Street - Suite 200, in the City of St. Louis, State of Missouri, before VICTORIA MENAUGH FAUSER, Certified Court Reporter in Missouri and Illinois and a Missouri Notary Public.

---

4

INDEX OF EXHIBITS

PLAINTIFF'S EXHIBITS

| EXHIBIT NO. | | PAGE NO. IDENTIFIED |
|---|---|---|
| 30 | Classes and Training | 36 |
| 31 | Class Syllabus Constitutional Law | 41 |
| 32 | Basic Recruit Final Evaluation | 46 |
| 33 | December 2012 Officer of the Month | 45 |
| 34 | Metropolitan Police Department Special Order 4/14/09 | 48 |
| 35 | Metropolitan Police Department Special Order 8/16/10 | 58 |
| 36 | Prisoner Processing Procedures | 71 |
| 37 | Metropolitan Police Department Special Order 12/30/09 | 76 |
| 38 | Ident-A-Band | 84 |
| 39 | Metropolitan Police Department Special Order 6/6/07 | 85 |
| 40 | Metropolitan Police Department Incident Report | 103 |
| 41 | Cedric Wright Driver's License and Social Security Card | 107 |
| 42 | | |
| 43 | Aerial Map | 94 |
| 44 | | |
| 45 | Cedric Wright REJIS Printout | 121 |
| 46 | Corey Leonard REJIS Printout | 128 |
| 47 | Corey Leonard REJIS Printout | 130 |

EXHIBIT C

21

1  up getting in a short foot pursuit with him and we ordered
2  him -- he got caught. He got ordered to the ground at
3  gunpoint, which he complied, you know, we got down on top of
4  him and put him in handcuffs and he ended up being a
5  juvenile, he was 16 years old, I believe, and we took him
6  home, we didn't charge him with anything but we took him home
7  and his mother decided that, you know, we had misused him and
8  she made a complaint. I believe that -- my Lieutenant I
9  believe is still working on that.
10      Q    Okay. Any others you can recall?
11      A    I think I've had one more but it was -- I can't
12 recall right this second what it was.
13      Q    Any Internal Affairs investigations?
14      A    No.
15      Q    And you know we're here today because our client
16 Cedric Wright was arrested on a warrant for Corey Leonard and
17 spent 62 days in jail. Are you familiar with that?
18      A    Yes.
19      Q    Do you know how that happened?
20      A    Well, basically I didn't -- on the day when we
21 arrested Mr. Wright for petty larceny which related from a
22 case of beer being stolen from a gas station.
23      Q    Right.
24      A    He was identified by the clerk as being the one who
25 had stolen the beer. As -- when we ran Mr. Wright through

22

1  our REJIS, you know, the database we use to run people to
2  find out their records, Department of Revenue records, all
3  that stuff, when we ran him in his record was a alias of
4  Corey Leonard and at the scene of where we actually caught
5  Mr. Leonard or -- and had the initial contact with him --
6      Q    You mean Mr. Wright?
7      A    Mr. Wright. I'm sorry, Mr. Wright. We -- you
8  know, we didn't look at it really close there. When we went
9  back to the station since he had those -- since he had that
10 alias in his thing, in his record I looked at Corey Leonard's
11 record as well and Corey Leonard had Cedric Wright's alias in
12 his record as well. Mr. Leonard has many aliases.
13      Q    Right.
14      A    So it is -- when people are like that -- people
15 have those kind of similarities we look into it a little bit
16 further. And when I saw the pictures of Mr. Leonard and
17 Mr. Wright's pictures in our system it was my belief that
18 they looked close enough together that I wanted to -- that I
19 ended up booking him on those warrants.
20      Q    So you're the one that booked him?
21      A    Well, I was the arresting officer.
22      Q    Did you book him?
23      A    No, my partner did.
24      Q    And what was your partner's name?
25      A    Officer Brian Eisele.

23

1      Q    Is Brian Eisele still a police officer in the 3rd
2  District?
3      A    Yes.
4      Q    Where is the 3rd District headquarters?
5      A    3157 Sublet. South Patrol building.
6      Q    So you received a call from the clerk at a Phillips
7  66 station at Gravois and Jefferson?
8      A    Yes.
9      Q    And this would have been on August 20th, 2011?
10     A    The 20th or was it the 11th?
11     Q    The 20th.
12     A    Okay, the 20th. Okay.
13     Q    And you located subsequently Mr. Wright?
14     A    Yes.
15     Q    And brought him back to the gas station and the
16 clerk pointed him out as having stolen some beer?
17     A    Yes.
18     Q    From the gas station?
19     A    Yes.
20     Q    And then you said when we ran Mr. Wright through
21 REJIS that in Mr. Wright's REJIS record was the alias Corey
22 Leonard?
23     A    Yes.
24     Q    You specifically recall that?
25     A    Yes.

24

1      Q    And then you said you didn't look at Corey
2  Leonard's record there on site but that you looked at it
3  later on when you got back to the station; is that right?
4      A    Yes.
5      Q    And when you said you ran Mr. Wright through REJIS
6  can you explain to the jury how that works?
7      A    Well, in the REJIS database -- REJIS is a company
8  that puts together this database. There is I believe five
9  different databases that they -- are included when we run
10 somebody.
11              One of them is MULES which is a Missouri-based
12 database. There is NCIC which is a federal database. And
13 there is three more which I'm -- the MULES and the federal
14 one are the ones that we -- that I sort of pay attention to.
15     Q    Sure.
16     A    I've got the screen in my brain right now but I
17 can't tell you which one.
18     Q    It's not a memory test. That's okay. So you have
19 a laptop in your patrol car?
20     A    Yes.
21     Q    And tell me what you did to access REJIS. Walk me
22 through the steps of what you did.
23     A    Basically we got Mr. Wright's information. I don't
24 remember if he told us what his name and date of birth were
25 or -- I don't believe looking at the booking sheet that he

25

1  had a Missouri I.D.  I don't know if he did or not.  But we
2  would have gotten it either from him or his Missouri I.D.
3          We entered it in the computer.  And then we
4  checked the databases that we -- that we use.  Usually when I
5  arrest somebody I check all of them because you want to see
6  if somebody has something serious out of California or
7  something like that, you want to make sure that you take care
8  of it, I guess.
9      Q   So within REJIS you don't just run someone's name
10 one time, you have to run it through each of the MULES or
11 NCIC or the other three databases?
12     A   Right.  Well, yeah, you check those databases.  It
13 gets run one time and then all those databases respond, I
14 guess.
15     Q   Okay.  And so just to be clear, the name that you
16 ran after first encountering Mr. Wright was the name Cedric
17 Wright?
18     A   Yes.
19     Q   And when you ran Cedric Wright's name do you recall
20 which database it was that you say listed Corey Leonard as an
21 alias of Cedric Wright?
22     A   I believe it was NCIC.
23     Q   Do you recall as we sit here today what you said to
24 Mr. Wright when that alias came up as Corey Leonard?
25     A   I don't recall my exact words, no.

26

1      Q   Did you ask him if he was Corey Leonard?
2      A   I don't remember if we did or not.
3      Q   Do you recall whether or not Mr. Wright had a
4  wallet?
5      A   Well, looking at his -- looking at the booking
6  sheet there was a wallet listed on the booking sheet so I
7  imagine he did have a wallet.
8      Q   Do you recall if he had a driver's license?
9      A   I don't recall.
10     Q   Do you recall if he had a Social Security card?
11     A   I don't recall.
12     Q   Sure.  All right.  So after you came across
13 information that you believe said that Cedric Wright had used
14 the alias Corey Leonard what did you do?
15     A   Once I saw that name was in there the general
16 practice is for us to run those other people.  When someone
17 has an alias we run those aliases.
18     Q   So if you ran the name Jim Hacking and it said that
19 I had used the alias Andrew Wismar then you would go ahead
20 and run the alias of Andrew Wismar?
21     A   Yes, I would try and run Andrew Wismar and see if
22 anything else came up in the system.
23     Q   And so that's what you did here?
24     A   Yes.
25     Q   And you ran -- because the NCIC computer you say

27

1  indicated that Cedric Wright had used the alias Corey Leonard
2  you then ran the name Corey Leonard through MULES and NCIC?
3      A   Yes, all the databases that we use.
4      Q   Sure.  And what did you uncover?
5      A   Well, Corey Leonard has a very extensive history.
6      Q   He does indeed.
7      A   With many aliases and different Social Security
8  numbers and birth dates.  Cedric Wright was listed in his
9  aliases.
10     Q   Okay.  Do you remember which database it was that
11 told you that?
12     A   I believe it was NCIC.
13     Q   In your experience as a police officer do you
14 generally find MULES or NCIC or one of the other three
15 databases to be more reliable than others?
16     A   I've never really known any of them to be
17 unreliable, if that's -- you know what I mean?
18     Q   You said that you like to use MULES and NCIC more
19 than the others.  Why is that?
20     A   Well, it's not so much that I like to use it more.
21 It's just that MULES -- you know, everything that's based in
22 Missouri -- all the databases that save NCIC is basically
23 based in Missouri.  So when we run people or articles, you
24 know, it usually ends up being in the other databases other
25 than NCIC.

28

1      Q   Okay.  We'll get back to that in a little bit.  I
2  want to get sort of some general background questions.  While
3  you've been a police officer since 2008 have you ever had a
4  situation where a person that you thought -- you thought they
5  were one person but they turned out to be another person?
6      A   I've had people that have lied to me a lot.
7      Q   Sure.  I'm sure that's true.
8      A   But usually you sit on them -- not sit on them.
9      Q   Physically.
10     A   You know, you kind of play the waiting game and
11 eventually, you know -- and you speak with them and
12 eventually they give up who they actually are, you know,
13 especially -- if someone's lying to me that means they --
14 most likely they have been arrested before and they are
15 playing the game and they are trying to get out of going to
16 jail.  So if that's the case then I can go into the computer
17 and find them usually if they've been arrested.
18     Q   Do you have the capacity in the car to run
19 someone's fingerprints?
20     A   No.
21     Q   So sort of at the time that you're interacting with
22 a subject in the police car it's basically based on your
23 conversation with the person and whatever identifying
24 documents they might have?
25     A   Yes.  As far as the information they are giving me.

109

1 or not.
2  Q  Do you recall Cedric Wright telling you that he was
3 not in fact Corey Leonard?
4  A  I don't remember that either specifically, no.
5  Q  If Cedric Wright had told you that he wasn't Corey
6 Leonard and he showed you his driver's license and he showed
7 you his Social Security card what if anything differently
8 would you have done?
9  A  You know, I don't know.  I -- there still is
10 someone, you know -- people can give me all the information
11 that they -- that they have on them.  Especially, you know --
12 even official documents.
13       But if there is an alias warrant out there and
14 I think that, you know -- if I think in good faith that this
15 person who in this case was Corey Leonard might have been the
16 same person as Cedric Wright then I would look into it
17 further.
18       I mean, because especially when we're talking
19 about felony charges where -- in this case Corey Leonard
20 obviously wasn't going to court on them and, you know, I feel
21 like it's my -- my duty to make sure that I make sure that
22 someone who is missing court or just not going to court takes
23 care of their charges.
24  Q  Okay.  Have you ever had a situation before where
25 someone gave you their driver's license, gave you their

110

1 Social Security card and they turned out not to be the person
2 that they said they were on those documents?
3  A  I believe -- I've had people give me a fake Social
4 Security card before but not a Missouri I.D.
5  Q  So prior to August 20th, 2011 you had never had a
6 situation where someone gave you both a fake driver's license
7 and a fake Social Security card?
8  A  No, I have not.
9  Q  Did you run Mr. Wright's driver's license through
10 the Department of Revenue?
11      MS. SCHUTE:  I'll object to that.  He said
12 that he doesn't recall seeing the driver's license.  That
13 assumes facts not in evidence.
14  Q  (By Mr. Hacking) I'll rephrase it.  If Mr. Wright
15 had given you his driver's license would you have run it
16 through the Department of Revenue website?
17  A  I would have run it through REJIS.  There -- I
18 don't believe there is actually a Department of Revenue box
19 to check.
20  Q  Okay.
21  A  But when you run people through all the databases
22 the Department of Revenue record comes up.
23  Q  Would that include their photo?
24  A  Yes.
25  Q  Their driver's license photo?

111

1  A  Yes.
2  Q  Do you recall whether or not you saw any pictures
3 of Cedric Wright in the patrol car at the time you arrested
4 him?
5  A  In the patrol car?
6  Q  On your computer screen.
7  A  I don't remember if I saw that or not.
8  Q  I thought you had testified earlier that you
9 compared pictures of Corey Leonard and Cedric Wright.  Did
10 that happen at some other time?
11  A  That happened probably at the station.  Because I
12 wanted to make sure what was going on.  Because I -- you
13 know, I looked at this thing -- this -- these two people and
14 I booked Mr. Wright on these charges based on the aliases and
15 the fact that I found -- I thought that they looked enough
16 alike for me to get it verified.
17  Q  Would you agree that a driver's license is a pretty
18 compelling piece of evidence as to someone's identity?
19  A  Yes.  If it's --
20  Q  If it's a valid driver's license?
21  A  If it's valid and -- I guess -- well, valid I guess
22 is the way to put it.
23  Q  If you were to run someone's information through
24 REJIS would their driver's license number be a piece of
25 information available to you?

112

1  A  Yes.
2  Q  And would their birth date be a piece of
3 information available to you?
4  A  Yes.
5  Q  And would their home address be a piece of
6 information available to you?
7  A  Yes, the home address that was given when they got
8 their driver's license.
9  Q  Right.  And that would be true of their gender and
10 their height and their weight and their eye color?
11  A  Yes.
12  Q  And when you ran them in REJIS that would also pull
13 up their LID number; is that right?
14  A  Yes, if they had one, yes.
15  Q  If they had one.  And you would expect someone who
16 had been previously arrested at some point by SLMPD to have
17 an LID number?
18  A  Yes, but I don't know exactly -- I don't know when
19 they issue a LID number.  If it's -- if they had misdemeanor
20 charges or felony charges or ordinance charges, I'm not
21 certain when they issue -- actually issue an LID number.
22  Q  Was there anything other than the reference within
23 Cedric Wright's REJIS search that he had used the alias Corey
24 Leonard that led you to book him for those three outstanding
25 warrants?

113

1  A   You mean in addition to the fact that there was
2  aliases matching?
3  Q   Yeah, anything other than aliases matching.
4  A   When I pulled up the pictures of Mr. Wright and I
5  looked at the pictures of Corey Leonard I felt like there was
6  issues in there that led me to book him on that. And by
7  issues, I mean bone structure around his eyes. Mr. Leonard
8  and Corey Leonard both have sort of a --
9  Q   Mr. Wright?
10 A   Mr. Wright. I apologize. They both have a bone
11 structure around their face like this that's almost kind of a
12 rounded triangle shape on both their eyes. Their noses
13 appeared very similar to me. Their lips appeared very
14 similar do me. The only thing I felt -- similarity enough
15 existed for me to book him on those felony warrants.
16 Q   Okay. So I just want to be clear. So one reason
17 that you thought that Cedric Wright was Corey Leonard was his
18 facial structure and the similarity in the photographs?
19 A   Yes.
20 Q   And another piece of information was the fact that
21 you believe that according to REJIS Cedric Wright had a
22 listed alias of Corey Leonard?
23 A   Yes.
24 Q   And then the third piece was that Corey Leonard
25 according to REJIS had used the alias Cedric Wright?

114

1  A   Yes.
2  Q   All right. And then you would have printed out
3  those REJIS fact sheets and attached them to the booking
4  forms for him to be processed when he reached the City
5  Justice Center?
6  A   Yes.
7        (Whereupon, a recess was held)
8  Q   (By Mr. Hacking) Did you review the Field Booking
9  Form before your deposition today?
10 A   I believe I did when we -- yes.
11 Q   What's an Arrest Register number?
12 A   That is -- the Arrest Register number is the
13 number -- actually it's a number that they use that
14 designates someone's arrest, I guess.
15 Q   Okay. Is that something that you get over the
16 computer while you're filling out the Field Booking Form?
17 A   No, that's something that the booking clerk when
18 she enters into REJIS it's supplied to her by REJIS.
19 Q   I gotcha. And the Field Booking Form, did you fill
20 that out in the patrol car or at the substation?
21 A   That would be --
22       MS. SCHUTE: Excuse me. I'll object. I don't
23 know that we've established he filled it out.
24       MR. HACKING: He said he did.
25       MR. EMERSON: Is this 40 --

115

1        MR. HACKING: This is 53.
2        MR. EMERSON: 53. Thank you.
3  A   Like I said, generally speaking they are filled out
4  at the book -- at the South -- at the area stations.
5  Q   (By Mr. Hacking) And I'm sorry, I thought earlier
6  you testified that you filled out the Field Booking Form on
7  Mr. Wright.
8  A   No, I was the one doing the --
9  Q   Right.
10 A   -- printouts.
11 Q   Okay.
12 A   And Officer Eisele was the one that was doing the
13 booking form.
14 Q   Okay. I'll hand you what we've marked as
15 Exhibit 53. Is that a Field Booking Form?
16 A   Yes.
17 Q   Is any of the handwriting on this form yours?
18 That's Exhibit 53 just to be clear.
19 A   No.
20 Q   Okay. Do you recognize any of the handwriting as
21 being Brian Eisele's?
22 A   I do.
23 Q   Which do you recognize as being his?
24 A   Everything except where Mr. Wright signed.
25 Q   Okay. And that's his signature there as the

116

1  arresting officer and the searching officer?
2  A   Yes, and then -- yes.
3  Q   Up above it says Arresting Officer Wismar?
4  A   Yes, we apparently had some mix-up as to who was
5  actually the arresting officer and who -- we saw -- I think
6  the booking clerk put me in there as the arresting officer
7  because of where I am up there, where my last name is. But
8  Brian probably signed it just as a matter of course in the
9  process of completing the booking.
10 Q   Okay. And this Field Booking Form says the last
11 name is Wright, the first name Cedric, middle name Maurice;
12 right?
13 A   Yes.
14 Q   And it has race black. Sex it says what?
15 A   Female.
16 Q   Date of birth?
17 A   8/23 of '69.
18 Q   POB, what's that?
19 A   Place of birth.
20 Q   Marital status single; height five nine; weight
21 165?
22 A   Yes.
23 Q   Complexion medium. Do you know what complexion
24 means?
25 A   Complexion is what I would call the tone of