UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CEDRIC WRIGHT,                                )
                                             )
              Plaintiff,                      )
                                             )
       v.                                     )          Case No. 4:12CV00107 AGF
                                             )
SAINT LOUIS BOARD OF POLICE                   )
COMMISSIONERS, et al.,                        )
                                             )
              Defendants                      )

## MEMORANDUM AND ORDER

Plaintiff Cedric Wright brings this action pursuant to 42 U.S.C. § 1983 claiming

violations of his constitutional rights stemming from his August 20, 2011 arrest and

subsequent incarceration in the City of St. Louis Correctional System from August 21,

2011 through October 20, 2011.  Sadly, Plaintiff was incarcerated during this period

based on warrants directed to another person.  The matter is now before the Court on

three motions for summary judgment filed by three groups of Defendants.  For the

reasons set forth below, summary judgment shall be granted in favor of all Defendants

with the exception of Benjamin Goins, Jr.

## BACKGROUND

### Arrest, Booking, and Detention

On August 20, 2011, at approximately 7:00 p.m., a clerk at a Phillips 66 gas

station in the City of St. Louis called 911 to report that a man had stolen an 18-pack of

beer from her store.  Based on the clerk's description of the perpetrator, the St. Louis

Metropolitan Police Department ("SLMPD") dispatcher broadcast that a black male in his late 30's or early 40's wearing a white T-shirt and blue jeans had stolen an 18-pack of beer from the gas station and was last seen walking on a nearby street. Defendants Andrew Wismar and Brian Eisele, police officers with the SLMPD, responded to the call and went to a park in the area where they saw an individual, later identified as Plaintiff, who matched the suspect's description. Plaintiff was either holding an 18-pack of beer or standing next to one, and per his own testimony, took a few steps back when the officers arrived.

Wismar and Eisele approached Plaintiff, informed him that he was being stopped regarding the theft of the beer. One of the officers handcuffed him, placed him in the police car and the officers transported him to the Phillips 66 station for identification by the store clerk. Plaintiff was, according to Eisele, cooperative, but Wismar testified that while Plaintiff was not actually combative, he "pushed back" and dragged his feet as they were making their way toward the police car. Wismar further testified that he placed his left foot on the back of Plaintiff's knee to get him to sit down in the car and that he then pushed Plaintiff into the car. Plaintiff testified that he was not resisting the officers and that Wismar opened the door and threw him in the car head first and as Plaintiff tried to get his right leg inside the car, Wismar slammed the door on his right leg. Plaintiff testified that he did not really feel any pain in his right leg on that day, but on the next day he felt a throbbing pain in the leg that lasted for about 10 to 15 minutes. Thereafter, he had a "knot" on his right shin for about two weeks.

Once in the patrol car, Plaintiff told the officers that his name was Cedric Wright and gave them his ID, likely his driver's license. Using the terminal in the car, Wismar searched Plaintiff's name in the Regional Justice Information Service ("REJIS"). REJIS is a computerized network utilized by various municipal police departments to run background checks on detained individuals. REJIS links an individual's name with various identifiers such as social security numbers and date of birth, and in some cases, indicates prior use of aliases. Each individual listed in REJIS is assigned a Local Identification Number ("LID") corresponding to the person's fingerprints.

Wismar testified that his REJIS search for the name "Cedric Wright" revealed that Cedric Wright, LID number 240901, and a "Corey Leonard," with a different LID number,[1] had in the past used each other's names as aliases; and that there were three active warrants out for Corey Leonard – for failures to appear on separate charges of felony gambling, felony stealing, and misdemeanor receiving of stolen property. Plaintiff testified that after Wismar looked Plaintiff's name up on the computer, Wismar told Plaintiff that he (Plaintiff) looked like and was Corey Leonard, and Plaintiff responded that he was not Corey Leonard but was Cedric Wright. (Doc. No. 153-23 at 6.)

---

[1]     The record indicates that there was confusion in the past between Corey Leonard, LID number 211878, and another individual named Charles Leonard, LID number 205094. Plaintiff has evidence that the warrants for Corey Leonard at issue here were improperly "packed" with the LID of Charles Leonard. He further contends that the "alias" connection with Plaintiff came from Charles Leonard, suggesting that there was no "alias" reference with Corey Leonard. But this is largely irrelevant, because the undisputed evidence is that Wismar linked Plaintiff to Corey Leonard as an alias by searching by name, and not by LID number, and Plaintiff has no evidence that his name in REJIS did not reflect an alias of Corey Leonard.

Wismar and Eisele then drove Plaintiff to the Phillips 66 station where the clerk identified him as the person who stole the beer; it is uncontroverted that Plaintiff had in fact done so. The officers then told Plaintiff that he was under arrest. The officers contend that at that time, Plaintiff was under arrest for the petty larceny. Plaintiff presented the deposition testimony of an SLMPD Captain that officers had an option in the case of a petty larceny to issue a citation and release the person or to book the person on the charge, in which case the person would only be in jail for about 24 hours, and that usually the former procedure was followed. Eisele testified (consistent with the above deponent's testimony) that it is within the arresting officer's discretion to arrest an individual on a petty larceny charge and that officers might have done so at that time due to a spate of thefts in the vicinity of the Phillips 66 station. Plaintiff contends that he was taken into custody only because Wismar, when searching REJIS, had seen the outstanding warrants for Corey Leonard.

Wismar and Eisele transported Plaintiff to the area station for booking and he was fingerprinted. Eisele completed the top portion of a Field Booking Form, identifying Plaintiff as "Cedric Maurice Wright." Eisele also entered the social security number and date of birth that Plaintiff gave him on the booking form, and the petty larceny charge. While Eisele completed these booking tasks, Wismar ran a second REJIS search. Wismar testified that this search again revealed that Plaintiff had an alias of Corey Leonard and Corey Leonard had an alias of Cedric Wright, among others. The search again showed the three warrants against Corey Leonard. The REJIS form listed several dates of birth for Corey Leonard, none of which matched Plaintiff's date of birth,

although the two men were close in age,[2] and five social security numbers, none of which matched Plaintiff's.

Wismar testified that he compared the REJIS photographs of Plaintiff and of Corey Leonard (photo date of 2/12/09) and that Plaintiff and Corey Leonard both "had a bone structure around their face" that was "almost kind of a rounded triangle shape on both their eyes" and had similar noses and lips. The REJIS form described Corey Leonard as medium build. Wright was 5' 9" and weighed 165 pounds. Both men were African American with a "med." complexion, black hair, and brown eyes. Wismar testified that he believed that Plaintiff was the individual named in the warrants. Wismar handed Eisele the REJIS printouts and asked him if the two photographs were of the same person. Eisele replied that he thought they were. It is undisputed that no effort was made to match Plaintiff's fingerprints with those on file for Corey Leonard.

Wismar decided to book Plaintiff on the three charges listed in the warrants for Corey Leonard, and they were added on the Field Booking Form. Plaintiff signed both pages of the Field Booking Form without asking any questions about it, but it is not clear if he did so after or before all four charges were listed on the form. After Plaintiff was booked, Wismar called the Warrant Fugitive Section to cancel the warrants for Corey Leonard and gave the booking form and REJIS printouts to the booking clerk. The booking clerk generated an Arrest Register from the handwritten information on the Field Booking Form. The Arrest Register contained the name "Corey Leonard" in handwriting

_____

[2] Plaintiff's date of birth is 8/23/69. One of the dates of birth shown for Corey Leonard on the REJIS form was 8/27/69.

in the "aliases/nicknames" section of the form. The Watch Commander reviewed and approved the Arrest Register and Plaintiff signed it, in effect certifying that his name and all his "personal information" on the form were correct.

Plaintiff presented evidence of concerns within the SLMPD during this time period of errors being made in the identification process at Prisoner Processing. Reflective of these concerns is an email dated August 25, 2011, from a sergeant to Prisoner Processing employees, stating as follows:

> Double-check LID numbers. Make sure you are using the correct LID for that prisoner. There are times when the name is run and the first LID number that comes up is being used. That LID number must be a CITY LID not county and must be on the correct subject. Make sure you are looking at the whole pedigree to make sure it matches the prisoner being booked. . . . These are simple mistakes and can be easily correct [sic] just by double-checking your work and taking you [sic] time. Even though they are simple mistakes to takes a [sic] a large number of man hours to fix them, slowing down the whole system.

After booking, Plaintiff was transferred to the St. Louis City Justice Center ("CJC") and the Sheriff's Department assumed custody of Plaintiff. There is some discrepancy in the record as to the time of this transfer of custody – it was either on August 21, 2011, or the morning of the next day, the day Plaintiff was to appear in court on the charges for Corey Leonard. He was scheduled to appear in Division 26 on Case No. 0822-CR05202-01 (misdemeanor receiving of stolen property), and in Division 25 on Case Nos. 0922-CR00381-01 and 0922-02343-0 (the felony charges).

Defendant Ruthann Alberti was then the highest ranking sheriff in the Sheriff Department's Criminal Records Unit, which keeps track of Sheriff's Department prisoners moving to and from court and the CJC. Alberti testified that when Plaintiff was

turned over to the custody of the Sheriff's Department, it received a copy of the warrant

with Corey Leonard's name and LID number 205094[3] on it, with the three charges

against Corey Leonard listed; Plaintiff's LID history, showing LID number 240901; and

a custody card.   The custody card did not show aliases, but according to Alberti, that was

the routine.  Alberti testified that after the SLMPD turns an arrestee over to the Sheriff's

Department with all the required paperwork, the Sheriff's Department does not further

verify the identity of the arrestee and holds the person until he or she is ordered released

by the court.  She testified that she never received training on how to verify the identity

of a suspect in the Sheriff Department's custody, and that there are no policies or

procedures that govern how to do so.  She further testified that she did not recall there

ever having been an error made in her office where following a judge's order to release

someone, the person was not released.  (Doc. No. 119-13.)

Defendant Benjamin Goins, Jr., a deputy sheriff, transferred Plaintiff on August

22, 2011, to the St. Louis Circuit Court for his initial appearances for all three cases.

Plaintiff testified that he did not ask Goins any questions on the way to court.  Plaintiff

was first brought to Division No. 26 on Case No. 0822-CR05202-01, the misdemeanor.

At that proceeding, the Honorable Elizabeth Hogan, Circuit Judge, ordered Plaintiff

released because he was not the proper defendant in the case.  For a reason that has not

---

[3]     As stated above, the evidence shows that the warrants for Corey Leonard continued, erroneously, to be associated with the 205094 LID number of Charles Leonard.

been unveiled, the two Division 25 felony cases were continued by the court to September 30, 2011,[4] and Plaintiff was returned to the CJC.

After receiving Judge Hogan's release order, Goins should have delivered a copy of the order to the Criminal Records Unit. Had he done so, a Sheriff's Department employee in the Unit would, in the normal course of events, have made a computer entry of the disposition in the case into the Integrated Jail Management System ("IJMS") on the same day. The record does not indicate that this was done for Case No. 0822-CR05202-01.

Plaintiff contends that had a case disposition been entered in IJMS for Case No. 0822-CR05202-01 on the day of Judge Hogan's order, the disposition of that case would have "negated" any valid judicial hold on the two Division No. 25 cases and that he would not have remained in custody on those two charges. But he offers no evidence in support of this contention. Alberti testified that even if the case disposition had been entered on August 22, 2011, Plaintiff would have remained in the Sheriff's Department's custody until further court order on the two Division No. 25 cases.

Plaintiff asserts that after being returned to the CJC and realizing that he was not going to be released, he asked Goins what he was being charged with, and Goins told him

_____

[4]    At oral argument, the parties noted that at this time there were activities ongoing in a felony division that resulted in a judge being suspended. The Court notes that the public records reflect that at the time, Division 25 was presided over by Judge Barbara Peebles and that the Missouri Commission on Retirement, Removal and Discipline had recommended removing her from her judicial position, noting among its findings that during this period of time, she engaged in a pattern of conduct that included frequently continuing cases, and going on vacation without making arrangement to continue her dockets or providing for a substitute judge to handle them. *In re The Matter of The Honorable Barbara T. Peebles*, Case No. SC92811, Answer Brief of the Commission.

there was a felony charge against him.  Plaintiff testified that he did not say anything else to Goins or to anyone else about his continued detention before he was transferred on August 24, 2011, to the City's Medium Security Institute ("MSI").  (Doc. No. 105-1 at 13-16.)

At MSI, Plaintiff was assigned a caseworker and permitted to make telephone calls.  Plaintiff presented evidence that at the time, the MSI was overcrowded and understaffed, with only one staff member in charge of classification of prisoners.  He testified that the first time he told a Corrections Officer at MSI about his situation was after he had been there for approximately one month.  The Corrections Officer told him that he wasn't supposed to be there, and Plaintiff started to talk to the other inmates about what to do.  *Id.* at 31-34.  At oral argument, Defendants contended, and Plaintiff did not dispute, that if requested, the case worker would have had the ability to schedule a court appearance for Plaintiff.  But Plaintiff never contacted his case worker.

The Sheriff's Department records do not indicate why Plaintiff did not appear in Division No. 25 on September 30, 2011, the appearance date scheduled after the August 22, 2011 continuance.  On or about October 16, 2011, on advice from a fellow inmate at the MSI, Plaintiff wrote a letter to Mary Fox of the Public Defender's Office explaining his situation.  On October 20, 2011, Plaintiff appeared in Division No. 16 and met Fox, who explained Plaintiff's situation to the Honorable John Garvey, Circuit Judge.  That same day, Judge Garvey reviewed all three of the Corey Leonard warrants, and issued a Release Order for Plaintiff on the two remaining cases, stating that Plaintiff was not the

proper defendant in any of the cases.[5]  Plaintiff was immediately released from custody, after being detained for 62 days.  He did not request or receive any medical treatment during his detention.

Defendant Mark Garanzini is the Office Coordinator for the SLMPD's Prisoner Processing Division.   He is a civilian, not a police officer.  He does not work at the station where Plaintiff's booking occurred, and does not process and book suspects or execute warrants.  Defendant Andrew Crews, now retired, worked at the SLMPD Headquarters and supervised officers and civilians in the Warrant Fugitive Section, including the five warrant clerks who cancel warrants once arrests are made and "pack" warrants by adding identifying information to them.  Crews had no personal involvement with the warrants at issue here, but they were packed by employees under his supervision.

**Municipal Custom and Policy**

In August 2011, the SLMPD had a Special Order in place that directed police officers how and when to use force appropriately.   The SLMPD also had Special Orders in place setting forth the appropriate procedures for arresting, booking, and processing arrestees at area stations and at the City Justice Center.  The Execution of Warrants and Other Criminal Process Special Order states that "Whenever possible, officers will verify the validity of a warrant prior to booking and attempt to reasonably guarantee the identity of the arrestee by checking identification documents."  (Doc. No. 115-9 at 3.)

---

[5]    The record indicates that the petty larceny charge was refused by the prosecutor on October 17, 2011.

Due to the use of aliases and other incorrect personal identifiers, as well as the possibility of mistakes during the booking process, it is the practice of the SLMPD to verify booking information by matching LID numbers and fingerprints on file with the fingerprints taken of the person arrested at the time of booking. This verification process is not employed in every case, and if used occurs after, rather than concurrent with, booking and often takes several days to a week to complete. If necessary, an error identification report ("EIR") is generated indicating that the fingerprints associated in REJIS with the LID number used for the booking do not match the fingerprints of the arrested individual. The EIR would alert the SLMPD, the Sheriff's Department, and the Department of Corrections to the error. The Board, however, did not have written policies about how to properly identify arrestees who claimed they were not the person named in the warrant upon which they had been arrested or booked.

**Incidence of Arrestee Misidentification**

Plaintiff offers records obtained in discovery reflecting that between August 2001 and mid-2013, the SLMPD misidentified 81 arrestees. Of these, 16 were arrested after Plaintiff. In 2011, there were 13 arrests due to misidentification. (Doc. No. 116-1 at 1-21.) In 22 of the 81 arrests, individuals were served warrants that did not reflect their LID numbers and the arresting officer and other SLMPD officials received an Alias Notification and/or Correct LID message, but failed to immediately release the improper subject.

The record does not reflect the total number of arrests by the SLMPD during this period. But Plaintiff has presented evidence that the SLMPD received between 50-75

new warrants from the Circuit Court each day that must be packed by a warrant fugitive clerk. (Doc. No. 121-17). The Court notes that this range of numbers is consistent with reported statistics that show that in 2011, a year in which, as noted above, Plaintiff's evidence indicates there were 13 arrests by the SLMPD due to misidentification, there were a total of approximately 35,000 arrests in the City of St. Louis. *See* Missouri Statistical Analysis Center of the Missouri State Highway Patrol report, "Crime in Missouri 2011."

Between 2008 and the end of 2012, in addition to the 81 individuals noted above, the Sheriff's Deputy in Division Nos. 25 and 26 recorded 10 individuals as either the "wrong person," "wrong defendant," or "arrested in error." The record does not reflect the total number of arrestees brought before the court in these Divisions during this period. In addition, for the period between January 1, 2007, and August 20, 2011, another 65 individuals were identified in the Division of Corrections database using the search terms "wrong defendant," "wrong person," "misidentified," or "misidentification."

Defendants offer documentary evidence and affidavits indicating that in the five years prior to 2011, the SLMPD's Internal Affairs Division received no complaints regarding the failure or alleged failure of SLMPD officers to properly identify individuals in their custody. Defendant Richard Gray, who had been on the Board since May 2010 and President of the Board since the fall of 2010, testified that prior to the filing of Plaintiff's lawsuit, the Board was not aware of any allegations regarding misidentification of arrestees by SLMPD officers and became aware of the circumstances surrounding Plaintiff's arrest only after this lawsuit was filed. He further testified that after the

lawsuit was filed, the Board discussed the issue of misidentification of arrestees during a closed, executive session with their attorney present.

In 2012, after Plaintiff's release, a St. Louis City government initiative known as PIVOT was initiated for the study of misidentification of arrestees as an area of concern for the City.

## Wismar's Training

Wismar's nine-month training program in the SLMPD's Police Academy included classroom instruction on topics such as constitutional law and the use of force, as well as classroom and field training on a wide range of other topics. Wismar also received annual training related to use of force and defensive tactics. At all times relevant to this suit, the SLMPD had special orders in place setting forth the procedures for the use of force by police officers. In addition, Wismar was certified to use REJIS and was required to renew his certification every three years.

## PLAINTIFF'S CLAIMS AND ARGUMENTS OF THE PARTIES

Plaintiff initiated this action on January 19, 2012, for declaratory judgment and damages against numerous Defendants from the SLMPD, the St. Louis Sherriff's Office, and the St. Louis Division of Corrections, as follows: the St. Louis Board of Police Commissioners ("the Board"); four members of the Board, in their official capacities (Francis Slay, Jr., Thomas Irwin, Bettye Battle-Turner, and Gray); Daniel Isom, in his official capacity as (former) Chief of Police of the SLMPD; Gerald Leyshock, in his official capacity as (former) Captain and Commander of the Third District of the SLMPD; Wismar and Eisele, in their official capacities as police officers and in their

individual capacities; Dale Glass in his official capacity as Commissioner of Corrections for the City of St. Louis; the St. Louis City Sheriff's Department; James W. Murphy, in his official capacity as St. Louis City Sheriff; the St. Louis City Division of Corrections; Charles Bryson in his official capacity as interim Commissioner of the Division of Corrections; Goins in his official capacity as a deputy sheriff and in his individual capacity; Crews, in his official and individual capacity; Alberti, in her official and individual capacity; and Garanzini, in his official capacity as a police booking officer and in his individual capacity.[6]

In ruling on motions to dismiss filed by various Defendants, the Court dismissed several claims and Doe Defendants. The following claims remain:

(1) Wismar, in his individual capacity, and Eisele, in his individual and official capacities, violated Plaintiff's Fourth and Fourteenth Amendment rights by arresting him without probable cause, both as to the arrest for petty larceny and as to the booking on the three charges lodged against Corey Leonard; (2) Eisele, Granzini, Crews, Alberti, and Goins in their individual capacities violated Plaintiff's Fourth and Fourteenth Amendment rights not to be detained for 62 days on two warrants directed to another individual's name after a judicial order to release him on a third warrant directed to that same other individual; Alberti in her individual capacity failed to adequately train her subordinates in how to deal with such a situation; (3) Wismar in his individual capacity,

---

[6]    Several of the Defendants listed above were initially named as Doe Defendants. Any remaining Doe Defendants who have never been identified are hereby dismissed for failure to prosecute. In addition, Glass was substituted for the initially-named Commissioner of Corrections, to reflect a change in personnel.

used unconstitutionally excessive force in effectuating Petitioner's arrest by shoving him into the police car and slamming the door on his leg; (4) the Board, the Sheriff's Department, and the Division of Corrections, acting through the related official-capacity individual Defendants, failed to establish adequate policies, training, and supervision of police officers, deputy sheriffs, and correctional officers, respectively, to avoid the use of excessive force and arrests (in the case of the Board) and detentions (in the case of all three entities) based on misidentification; and (5) state law claims for false arrest and false imprisonment against Wismar, Eisele, Garanzini, Crews, Goins, and Alberti.

**Motion for Summary Judgment – Doc. No. 97**

The first motion for summary judgment before the Court is brought by the members of the Board (Slay, Irwin, Battle-Turner, and Gray); the supervisory police Defendants in their official capacities (Isom and Lyshock); and Wismar. As the movants note, a suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity. *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). Accordingly, the Court will refer to the moving Defendants, with the exception of Wismar, as the Board.

The movants argue that the Court should grant summary judgment in favor of Wismar, in his individual capacity, on the constitutional claim for unlawful arrest because the undisputed facts show that Wismar had probable cause to arrest Plaintiff for petty larceny, and on the excessive force claim because the undisputed facts show that Wismar only used *de minimis* force to effectuate the arrest. They argue in the alternative, that Wismar is entitled to qualified immunity on these two claims. The movants further

argue that the record shows that Wismar had an objectively reasonable basis for arresting and booking Petitioner on the three warrants, and that in any event, Wismar is entitled to qualified immunity on this claim too.

The Board argues that it cannot be held municipally liable because Wismar did not violate Petitioner's constitutional rights and further, Petitioner cannot prove that the Board had a custom or policy of misidentifying arrestees. The Board argues further that Plaintiff cannot prove causation between a municipal policy, custom, or lack of training or supervision, and the alleged constitutional violations. It argues, in reliance on Gray's deposition testimony, that there is no evidence that the Board had notice of misidentifications of arrestees and failed to address or tacitly authorized such conduct, or that it had notice of inadequate training or inadequate supervision on this matter. Thus, the Board argues, "there cannot be a genuine issue of material fact as to whether they knew that a lack of written policies about how to properly identify arrestees would likely result in a constitutional violation." Lastly, the movants argue that the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claim against Wismar for false arrest and false imprisonment.

In response (Doc. No. 116), Plaintiff argues that the Board is not entitled to summary judgment because there are genuine issues of material fact regarding whether the Board has been deliberately indifferent to the alleged "systemic failures" within the SLMPD that caused the wrongful detention of Plaintiff, and failed to train and supervise the SLMPD officers to avoid such detentions. Plaintiff argues that the Board's liability is not dependent upon Wismar's individual liability, and that the past misidentification

cases put the Board on notice of a misidentification problem, and specifically, of arresting officers ignoring LID numbers, and also "other obvious information" proving that the person in custody was not the proper subject of the warrant. Plaintiff maintains that these problems were "repeated and known" in the SLMPD's warrant fugitive, prisoner processing, and identification sections. He argues that summary judgment in the Board's favor is inappropriate because of the pattern of alias notifications being ignored, and the SLMPD's failure to train employees on how to handle claims of misidentification.

Plaintiff argues that Wismar is not entitled to qualified immunity on Plaintiff's Fourth Amendment claim against unreasonable seizures because there is a genuine issue of material fact as to whether handcuffing Plaintiff during the investigative stop to transport him for the show-up identification by the store clerk was objectively reasonable in that nothing indicated that Plaintiff was armed or dangerous.

Plaintiff argues that summary judgment on the basis that Plaintiff would have been detained regardless of whether or not Wismar wrongfully served Corey Leonard's warrants on Plaintiff is precluded because there are genuine issues of material fact as to whether Wismar detained Plaintiff on the petty larceny charge. Lastly, Plaintiff argues that Wismar had information available to him that would have told him that he had the wrong person on the felony warrants, and thus a jury could find that he was deliberately indifferent to Plaintiff's Fourth Amendment rights, precluding qualified immunity. Plaintiff asserts that Wismar had no probable cause to believe that Plaintiff was Corey Leonard.

The moving Defendants reply that Plaintiff did not claim in his complaint that it was objectively unreasonable for Wismar and Eisele to handcuff him and transport him to the gas station for a show-up identification, and accordingly, this new claim is not properly before the Court. They argue that in any event, the undisputed material facts demonstrate that Wismar was objectively reasonable in handcuffing Wright while transporting him to the gas station. The movants also argue that Plaintiff cannot prevail on his excessive force claim against Wismar because Plaintiff testified that four officers arrived at the park and he could not say which one pushed him into the police car.

**Motion for Summary Judgment – Doc. No. 103**

The second motion for summary judgment under consideration was filed by Murphy and the Sheriff's Department; the Division of Corrections and Glass; Goins and Alberti.[7] These movants first note that the claims against the Sheriff's Department are duplicative of the claims against Murphy in his official capacity, as are the claims against the Division of Corrections and the claims against Glass in his official capacity. The movants argue that the uncontroverted material facts establish that Plaintiff never made Goins aware of the fact that Plaintiff was not Corey Leonard, and Plaintiff therefore cannot establish that Goins was anything more than negligent on August 22, 2011, let alone that his actions were criminally reckless, which, they argue, is required for a finding of a constitutional violation in this context. Movants argue that the only failure to follow official policy by an individual in the Sheriff's Department was not making the

_____

[7]     Although the caption of the motion does not include Goins and Alberti as among the Defendants on whose behalf the motion was filed, the memorandum in support of the motion argues that they too are entitled to summary judgment on all claims against him.

IJMS entry to reflect Plaintiff's release from Case No. 0822-CR05202-01 on August 22, 2011, but that this was at most negligence and, in any event, Plaintiff would still have remained in the custody of the Sheriff's Department due to the "valid judicial holds" on the two felony charges.

Movants argue that Alberti and Goins are entitled to qualified immunity in their individual capacities, and further, that there therefore can be no municipal liability for the Sheriff's Department or the Division of Corrections or their supervisory employees in their official capacities. The movants in this motion also urge the Court not to exercise pendant jurisdiction over Plaintiff's common law claims and dismiss them without prejudice.

Plaintiff responds (Doc. No. 119) that the question of whether Alberti and Goins are entitled to qualified immunity in their individual capacities would not determine whether the Sheriff's Department (Murphy in his official capacity) or the Division of Corrections (Bryson in his official capacity) were deliberately indifferent to a pattern of detaining and incarcerating the wrong individuals based on misidentification, and failing to train/supervise its employees on this matter. He further argues that Alberti may be liable for a failure to supervise even without having personally participated in any constitutional deprivation or knowing about any violation at the time it occurred.

Plaintiff asserts that there are genuine issues of material fact with regard to whether the Sheriff's Department had a custom of knowingly accepting custody of prisoners on warrants issued to a different individual. He argues that the Sheriff's Department should never have accepted Plaintiff into its custody on the warrant with LID

number 205094, and that the discrepancy between the LID numbers on the warrant and on Plaintiff's LID history establishes a genuine issue of material fact whether Alberti and Goins "were deliberately indifferent to the information in their possession informing them that the wrong person was in custody." Plaintiff also challenges the Sheriff's Department's failure to have policies or procedures for a deputy to follow when a suspect asserts he has been misidentified.

Plaintiff stresses that if he was not the proper defendant on one of the charges with LID number 205094, then he was not the proper defendant on any of the charges with LID number 205094. He asserts that he has "uncovered an egregious pattern in which the Sheriff's Department has failed to execute court orders by judges in the 22nd Judicial Circuit Court, and a pattern of cases where the Sheriff's Department continues to detain an individual even after they know they have been misidentified." He notes that in 22 of those cases, the Sheriff's Department continued to detain an individual after an Alias Notification and Correct LID message was sent informing Alberti's office that the individual arrested and detained was not the proper defendant. It is undisputed that no such Alias Notification and Correct LID message was sent to the Sheriff's Department with regard to Plaintiff's arrest.

Lastly, Plaintiff argues that Division of Corrections and Glass failed to meet their burden to establish that there is no genuine issue of material fact and that they are entitled to summary judgment as a matter of law, because there is a fact question as to whether Division of Corrections, like the Sheriff's Department, "was deliberately indifferent to a pattern of detaining and incarcerating the wrong individuals based on misidentification."

He points to evidence that during his incarceration the MSI was overcrowded and the Division of Corrections was understaffed and experiencing a failure in leadership, and did not provide adequate training for employees to know what to do if an inmate claimed he had been misidentified.

## Motion for Summary Judgment – Doc. No. 150

The third motion for summary judgment was filed by Eisele, Garanzini, and Crews. They first argue that the Court should grant them summary judgment in the official capacity claims against them because these claims are duplicative of the claims against the members of the Board who are being sued in their official capacities. Eisele then argues that he is entitled to summary judgment on the warrantless arrest claim because the undisputed facts demonstrate that Eisele had probable cause to arrest Plaintiff for petty larceny. He argues that even if the booking of Plaintiff on the warrants directed to Corey Leonard gave rise to a constitutional claim, Eisele is entitled to qualified immunity on that claim because he had an objectively reasonable belief that the warrants were for Plaintiff.

Garanzini and Crews argue that they should be granted summary judgment on Plaintiff's constitutional claims because they had no involvement in Plaintiff's arrest or booking, or his processing at the CJC. All three movants argue that the Court should decline to exercise supplemental jurisdiction over Plaintiff's supplemental state law claims against them.

In response, with respect to Eisele's entitlement to summary judgment on Plaintiff's Fourth Amendment claims, Plaintiff raises the same arguments he did as to

Wismer, namely, that there is a genuine issue of material fact as to whether Eisele violated Plaintiff's right against unreasonable seizures by putting Plaintiff in handcuffs for the show-up identification when such force was not objectively reasonable under the circumstances; that a genuine issue of material fact exists as to whether Eisele arrested Plaintiff for the petty larceny charge; and that a fact question is presented on whether attributing to Plaintiff warrants issued for Corey Leonard was objectively reasonable. Plaintiff also argues that there is a question for the jury on whether Eisele used excessive force in effecting Plaintiff's arrest.

Plaintiff argues that Crews and Garanzini are not entitled to summary judgment on the claims that they are individually liable for failing adequately to train their subordinates.

## DISCUSSION

### Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this review, the facts and all reasonable inferences must be construed in favor of the non-moving party. But "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citation omitted). "The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with

specific facts showing that there is a genuine issue for trial.'" *Briscoe v. Cnty. of St. Louis, Mo*., 690 F.3d 1004, 1011(8th Cir. 2012) (citation omitted). The nonmovant "must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor." *Reed v. City of St. Charles, Mo*., 561 F.3d 788, 790-91 (8th Cir. 2009) (citation omitted).

## Qualified Immunity

As noted above, several Defendants raise the defense of qualified immunity on various claims. The Supreme Court recently explained the doctrine of qualified immunity as follows:

> An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate.

*Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

An official is not entitled to qualified immunity when "every reasonable official would have understood that what he is doing violates" a constitutional right. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2078 (2011) (citation omitted). A court must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff,* 134 S. Ct. at 2023; *see also Blazek v. City of Iowa City*, No. 12-3785 , ___ F.3d ___, 2014 WL 3824361, at *4 (8th Cir. Aug. 5, 2014); *S.L. ex rel.*

*Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs*, 725 F.3d 843, 853 (8th Cir. 2013).

In considering the question of qualified immunity, a district court must determine which facts are genuinely disputed and view those facts favorable to the nonmovant "as long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them." *Handt v. Lynch*, 681 F.3d 939, 945 (8th Cir. 2012) (citation omitted). Then the court should determine if those facts demonstrate a constitutional violation that is clearly established. *Id*. "To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Id*. at 943.

**Excessive Force Claims**

"The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to affect it." *Samuelson v. City of New Ulm*, 455 F.3d 871, 875 (8th Cir. 2006) (citation omitted). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, at the time the force was applied rather than with the 20/20 vision of hindsight." *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000) (citation omitted).

In *Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. June 6, 2011), two months before Plaintiff's arrest, the Eighth Circuit recognized for the first time that police conduct that causes only *de minimis* injury could constitute excessive force. *Chambers*, 641 F.3d at 906. The Court explained that "[t]he degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted." *Id.* Nevertheless, "[t]he degree of injury is certainly relevant insofar as it tends to show the amount and type of force used," and "it remains firmly established that not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 906-07 (citation omitted). Furthermore, "officers are not required to treat detainees as gently as possible." *Blazek*, 2014 WL 3824361, at *4.

A. Wismar and Eisele

With respect to the claim of excessive force against Wismar, [8] and construing the facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff's own testimony establishes that he suffered no more than *de minimis* injury. *See Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006) (holding that "relatively minor scrapes and bruises" are to be considered *de minimis* injuries). In light of the *de minimis* nature of the injury here, even accepting Plaintiff's testimony that he was not resisting the officers, and Eisele's characterization of Plaintiff's behavior as "cooperative," the Court does not

---

[8]     The Court finds disingenuous the relevant Defendants' argument that Plaintiff cannot prevail on an excessive force claim against Wismar because Plaintiff could not identify which officer at the scene pushed him into the police car and allegedly slammed the door on his leg; Wismar himself testified that he was the officer involved.

believe that a jury question exists regarding the objective reasonableness of the force used by Wismar.  Although the fact of *de minimis* injury is not dispositive, the *de minimis* nature of the injury here undermines Plaintiff's allegation that Wismar slammed the police car door on his foot in a manner to constitute excessive force.  And this is not a case where the force was exerted gratuitously; rather it was for the purpose of getting Plaintiff into the police car.  *Cf. Blazek*, 2014 WL 3824361, at *5 (affirming the denial of qualified immunity on the plaintiff's excessive force claim where the plaintiff alleged that he was subdued and compliant, but that the officers grabbed him by the arms and gratuitously "jerked" him from the floor onto the bed, using enough violent force to cause significant injury); *Chambers*, 641 F.3d at 907-08 (concluding that the plaintiff stated an excessive force claim despite the absence of significant injury, where he alleged that one officer kicked him several times on both sides of his body, although he was restrained on the ground and offering no resistance, another officer repeatedly choked and kicked him during the trip to the hospital, and a third officer extended the journey by taking a roundabout route and intentionally driving so erratically that the plaintiff was jerked roughly back and forth in his car seat while his head was positioned adjacent to the dashboard).

This conclusion is even more clear with respect to Eisele, as Plaintiff's evidence in no way implicates Eisele in the actions of shoving Plaintiff and slamming the door.

B.  Garanzini and Crews

Upon review of the record, the Court finds no connection between the conduct or responsibilities of Garanzini and Crews and the alleged excessive use of force.  For this

reason the court will grant the motion of Crews and Garanzini for summary judgment on Plaintiff's excessive force claim. *See, e.g., Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (requiring personal involvement or inaction amounting to deliberate indifference for liability under § 1983).

      C.  <u>The Board (and Official-Capacity Police Defendants)</u>

      The claims against the Board based on the allegations that they failed to adopt appropriate policies on the use of force in effecting an arrest, that the policies that were in place failed to prevent a violation of Plaintiff's constitutional rights, and that there was a failure adequately to train or supervise officers on the appropriate use of force, all fail because Plaintiff has not established an underlying constitutional violation with respect to Wismar's (or Eisele's) use of force in effecting the arrest here. *See Walton v. Dawson*, 752 F.3d 1109, 1126 (8th Cir. 2014) (citing *Carpenter v. Gage*, 686 F.3d 644, 651 (8th Cir. 2012) ("Without a showing that the deputies violated the Constitution, however, there can be no liability for failure to train.")); *Fairley v. Luman*, 281 F.3d 913, 916 (9th Cir. 2002). Nor has Plaintiff presented evidence that the Board's policies were inadequate, or that any lack of training was the cause of the alleged violation.

**Arrest Without Probable Cause**

      "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause." *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008). Probable cause will be found where the totality of the circumstances in the information available to the officers at the time of arrest "warrant a belief by a prudent person that an offense has been . . . committed by the person to be arrested." *Fagnan v. City of Lino Lakes, Minn.*,

745 F.3d 318, 324 (8th Cir. 2014); *see also Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010). For purposes of a probable cause analysis "officers are generally entitled to rely on the veracity of information supplied by the victim of a crime." *Peterson v. City of Plymouth*, 60 F.3d 469, 474-75 (8th Cir. 1995).

A. Wismar and Eisele

In response to Wismar and Eisele's contention that they had probable cause to arrest him for the petty larceny, Plaintiff argues that the officers unreasonably exceeded the scope of a Terry stop by handcuffing him. The Court concludes, however, that Wismar and Eisele are entitled to qualified immunity on Plaintiff's claims challenging the handcuffing.[9] Construing the facts most favorably to Plaintiff, when Wismar and Eisele first saw Plaintiff, his physical appearance and clothing matched the description of the perpetrator, and Plaintiff was standing beside a case of beer like the one that was stolen soon after the incident and in an area near the scene of the offense, and when he saw the officers, he took some steps back. On these facts, the Court believes the officers had probable cause to arrest Plaintiff. Even if there was no probable cause, the Court believes

---

[9] The Court rejects the argument by the relevant Defendants that this claim is not properly before the Court. In his complaint Plaintiff set forth the facts of his initial encounter with Wismar and Eisele, the handcuffing, transporting him to the Phillips 66 station, and arresting him for the petty larceny; and one of his claims was that Wismar and Eisele violated his Fourth Amendment rights by placing him under arrest without a valid warrant, probable cause, or reasonable suspicion of illegal conduct. While the complaint focuses mainly on the arrest and detention for the charges against Corey Leonard, it cannot be said that Plaintiff failed to raise a Fourth Amendment claim based on the officers' conduct surrounding the arrest for petty larceny. Defendants have not pointed to any discovery responses or other material wherein Plaintiff waived this claim.

the officers would be entitled to qualified immunity, as the Court cannot say under these facts that it would be clear to reasonable officers that probable cause was lacking.

At a minimum, in any event, on these facts the officers were justified in conducting an investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968). At the time relevant to this case, it was not clearly established that police officers could not transport a suspect a short distance for a show-up identification, and in so doing, handcuff him for officer safety while transporting him in the police car. Plaintiff acknowledges that he has found no cases stating that this would violate the suspect's Fourth Amendment rights, (Doc. No. 116 at 27 n.14), nor has the Court found any such cases. Plaintiff relies on *El-Ghazzawy v. Berthiaume*, 636 F.3d 452 (8th Cir. 2011), for the proposition that the use of handcuffs during a Terry stop requires some reasonable suspicion that the suspect is dangerous. But Plaintiff's reliance is misplaced as that case did not involve handcuffing during the transport of a suspect in a police car.

Here, Wismar and Eisele could have reasonably believed that it was permissible to transport Plaintiff in the police car to the gas station for the clerk to identify Plaintiff, and that it was reasonable to handcuff him for officer safety for the purpose of transporting him in the police car. *See United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006).[10]

---

[10]     Plaintiff nowhere challenges the legal authority of the officers to arrest him without a warrant for petty larceny. But even if he had, the officers would be entitled to qualified immunity, as it was not clearly established that Plaintiff could not be arrested without a warrant for the petty larceny that was committed outside the presence of Wismar and Eisele under the Fourth Amendment. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 341 n.11 (2001) ("We need not, and thus do not, speculate whether the Fourth Amendment entails an 'in the presence' requirement for purposes of misdemeanor arrests."), citing *Welsh v. Wisconsin*, 466 U.S. 740, 756 (1984) (White, J., dissenting)

There's no suggestion that transporting him to the gas station extended the detention longer than the time it would have taken to arrange to bring the clerk to where Plaintiff was being detained. While *Martinez* and a few other cases may have involved the investigation of serious or violent felonies, the cases do not expressly so limit their holdings.

A closer question is presented with respect to Plaintiff's claims based on Wismar's and Eisele's decision to book Plaintiff with the three charges in the warrants for Corey Leonard. In *Hill v. Scott*, 349 F.3d 1068 (8th Cir. 2003), after canvassing cases where officers mistook the arrestee for the subject of a warrant issued for another person, the Eighth Circuit explained as follows:

> The rule in those cases is that mistaken arrest based on a facially valid warrant does not violate the Fourth Amendment if the officers reasonably mistook the arrestee for the person named in the warrant. *Hill v. California*, 401 U.S. 797, 802 (1971) ("When the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest."). We

---

("[T]he requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment, . . . and we have never held that a warrant is constitutionally required to arrest for nonfelony offenses occurring out of the officer's presence.") (citations omitted); *Virginia v. Moore*, 553 U.S. 164, 173-76 (2008) (holding that police officers did not violate the Fourth Amendment by arresting a motorist whom they had probable cause to believe had committed a misdemeanor under state law, even though, as matter of state law, this misdemeanor offense was one for which, under the circumstances of the case, officers should have issued a summons rather than made an arrest; officers' violation of state law in making the arrest did not affect its reasonableness, for Fourth Amendment purposes); *Rockwell v. Brown*, 664 F.3d 985, 996 (5th Cir. 2011) (holding with respect to a 2005 arrest that the law was not clearly established whether a warrantless arrest for a misdemeanor not committed in the presence of the arresting officer violated the Fourth Amendment, and, thus, police officers were entitled to qualified immunity from a claim for a warrantless arrest, even though the alleged misdemeanor occurred before they arrived on the scene); *see generally* 3 W. LaFave, Search & Seizure § 5.1(c) (2013).

answer this question by looking at the totality of the circumstances surrounding the arrest to determine its reasonableness.

*Hill*, 349 F.3d at 1072-73.

As noted above, Eisele and Wismar assert that they are entitled to qualified immunity on this claim. Here, Plaintiff does not contend that the warrants for Corey Leonard were not valid. And, as in *Hill*, this is not a situation where Eisele or Wismar knew Plaintiff "was not the subject of the warrant, or where [they] knew further investigation would have revealed there was no warrant for [Plaintiff]." *Hill*, 349 F.3d at 1073. "[T]here can always be more investigation to verify identity. The question is, how much investigation does the Constitution require?" *Id*. at 1074.

In this case, Plaintiff has not produced evidence to call into question the fact that REJIS identified Plaintiff and Corey Leonard as using each other's aliases,[11] and Wismar's testimony that both he and Eisele believed that Plaintiff was the individual named in the warrants based on a comparison of Plaintiff's and Corey Leonard's photographs is uncontroverted. Plaintiff has not offered any evidence to suggest that he and Corey Leonard did not, in fact, resemble each other, and the record establishes that he and Corey Leonard were approximately the same age and race, were of medium build, and had black hair, brown eyes, and a medium complexion. And even Plaintiff has acknowledged that the use of aliases by individuals arrested by the SLMPD was not uncommon.

---

[11] The Court notes that Plaintiff signed his Arrest Register which showed Corey Leonard as an alias. Furthermore, had Plaintiff's name not been associated with Corey Leonard as an alias, Wismar's first REJIS search would not have brought up Corey Leonard's name.

Comparison of the two individuals' fingerprints would have revealed that the outstanding warrants were not for Plaintiff.  But the Court concludes that in light of all the circumstances, including the use by Corey Leonard and Wright of each other's names as aliases, thereby creating the confusion that led to Plaintiff's arrest on these warrants, the similarity in appearance of Corey Leonard and Wright, and the absence of evidence of any repeated assertions by Plaintiff that he was not Corey Leonard, "no reasonable officer would have known failing to investigate further would violate the Fourth Amendment."  *See Hill*, 349 F.3d at 1074; *see also Young v. Little Rock*, 249 F.3d 730, 735 (8th Cir. 2001) (holding in a case of mistaken identification that the arresting officer and supervising sergeant were entitled to qualified immunity with respect to their decision to hold plaintiff over the weekend and wait for a judge to make the final determination whether she was the person named in the warrant);  *Simmons v. Bryant*, No. 4:06CV1045 CDP, 2007 WL 2693746, at *3-4 (E.D. Mo. Sept. 10, 2007) (granting qualified immunity to officers who arrested a person on a warrant in his brother's name, where the two brothers had a practice of using each other's names and officers took reasonable steps to ascertain the identity of the arrestee); *cf. Kennell v. Gates*, 215 F.3d 825, 828-29 (8th Cir. 2000) (stating that "an unreasonable or negligent" refusal to investigate claims of mistaken identity of an individual detained pursuant to a facially-valid warrant does not amount to a constitutional violation; but affirming the jury verdict against the officer in light of evidence that he was aware of the mistake and failed to act); *Cannon v. Macon Cnty.*, 1 F.3d 1558, 1564-65 (11th Cir. 1993) (concluding that a police officer was not entitled to qualified immunity from a claim by an individual he arrested

due to misidentification where there was evidence that the officer completed the arrest form based only on information from a police computer about the person who was wanted and failed to take any steps to identify the arrestee in the face of her repeated assertion of mistaken identity and her not resembling the wanted person).

This is not a case where the misidentified arrestee made repeated and continuous protests that he was not the person in a warrant. S*ee, e.g., Fairley*, 281 F.3d at 917-18. Here, the only evidence presented by Plaintiff that he protested to the officers on the matter of his identification was that at the initial stop he told the officers that he was not Corey Leonard. But there is no dispute that Plaintiff did not repeat this assertion to any of the law enforcement personnel during his arrest or while in their custody. And he signed the Arrest Register that listed both the Corey Leonard alias and the warrants. Accordingly, the Court will grant Wismar and Eisele summary judgment based on qualified immunity as to this claim. They conducted an investigation that provided a reasonable basis to believe that the warrants were for Plaintiff, and their conduct was, at most, negligent. And though appearance before a court does not relieve officers of their own responsibility to take reasonable care properly to identify arrestees on warrants, one should reasonably be able to assume the court system could rectify any error. Indeed, had the Division 25 cases not been inexplicably continued, or had Judge Hogan's order been given proper attention, Plaintiff would likely have been released the next day.

B. The Board (and Official-Capacity Police Defendants)

The Board can be held liable under § 1983 on a theory of municipal liability if Plaintiff's constitutional rights were violated pursuant to an official custom, policy, or

practice of the Board. *See Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011); *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citing *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690-92 (1978)).

To establish a custom or practice by the Board in the present context, Plaintiff must show (1) the existence of a widespread pattern of similar unconstitutional misconduct by the SLMPD, (2) deliberate indifference to that conduct by the Board, and (3) that Plaintiff was injured by the misconduct. *See S.L. ex rel. Lenderman*, 725 F.3d at 854. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [its] action." *Connick*, 131 S. Ct. at 1360 (citation omitted).

When a municipal entity is on actual or constructive notice that a particular omission in its training program causes city employees to violate citizens' constitutional rights, the entity may be deemed deliberately indifferent if it chooses to retain that program. *Id.*; *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013) (holding that a plaintiff can avoid summary judgment "if he could demonstrate some municipal action or inaction, taken with deliberate indifference as to its known or obvious consequences" that would violate an individual's constitutional rights);

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. . . . [A] municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact. Only then can such a shortcoming be properly thought

> of as a city "policy or custom" that is actionable under § 1983. "Deliberate
> indifference" is a stringent standard of fault.

*Connick,* 131 S. Ct. at 1359-60 (holding that need for training was not so obvious that

district attorney's office was liable on failure-to-train theory when nondisclosure of

blood-test evidence had resulted in a defendant's wrongful conviction and in his spending

18 years in prison); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989).

Here, Plaintiff claims that the Board was deliberately indifferent to a pattern of

wrongful arrests based on misidentification and that the Board failed to implement

policies and to adequately train and supervise SLMPD officers to prevent such arrests.

Plaintiff characterizes the Board's actionable conduct in various ways: the absence of a

policy in cases where the arrestee asserts that he is not the person named in a warrant

requiring SLMPD officers to employ the fingerprint verification process to ensure that

the arrestee has not been misidentified; the absence of training to make sure officers

understand the importance of checking LID numbers; the failure to provide training on

proper identification techniques when a person asserts he has been misidentified; the

absence of a written policy or procedure instructing prisoner processing clerks to run the

individual's prints with the LID number on the warrant when there is a conflict between

the LID number provided by the arresting officer and the LID number located on the

warrant.

The Court believes that a close question is presented with regard to whether the

Board is entitled to summary judgment, but upon careful review of the record, the Court

concludes that Plaintiff's evidence, viewed in the light most favorable to him and

drawing all reasonable inferences in his favor, is not sufficient for a reasonable jury to find the existence of a policy or custom, or lack thereof, that caused a violation of his constitutional rights. Plaintiff's evidence does not show a "continuing, widespread, persistent pattern" of unconstitutional misconduct by SLMPD police officers "similar to the violation at issue here." *Connick*, 131 F.3d at 1360. Nor does Plaintiff's evidence show a failure to train or supervise SLMPD police officers to avoid misidentification of arrestees when aliases are involved. *See id.* (holding there can be no municipal liability without notice that a course of training is deficient "in a particular respect").

While any case of misidentification is clearly a very serious matter, the misidentifications catalogued by Plaintiff are not pervasive in light of the large number of arrests made each year by the SLMPD.[12] Further, many of the incidents cited by Plaintiff involved facts that are quite dissimilar from the facts here. For instance, no notice of the misidentification was sent and disregarded with respect to Plaintiff's arrest. And in many of the incidents, the misidentification was remedied by actions of the law enforcements personnel or by a prompt court appearance.

With the notoriety of the present case, the landscape might be different, and future cases of misidentification under similar circumstances might warrant a different result.

C. <u>Garanzini and Crews</u>

For reasons similar to those supporting the grant of summary judgment to the Board on the misidentification "custom or policy" and "failure to train" claims, the Court

---

[12]    Even if the number of arrests were half of what the State Highway Patrol report suggests, this Court's determination with regard to the pervasive nature would be the same.

also will grant summary judgment on qualified immunity to Garanzini and Crews, in their individual capacities, on the failure to train and supervise their subordinates to prevent arresting and booking misidentified individuals. There is no case law clearly establishing the need to conduct a fingerprint comparison prior to or contemporaneously with an arrest. And where, as here, the similar incidents were not pervasive in light of the arrests overall, the Court cannot find that Plaintiff has met the more stringent standard of "deliberate indifference" required for failure to train claims.

**Due Process Claims for Failure to be Released Upon Judge Hogan's Order**

A citizen has a protected liberty interest in being free from wrongful incarceration, even for a short time, after a judge orders his release. *Davis v. Hall*, 375 F.3d 703, 712-13 (8th Cir. 2004) (citing *Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001), and citing with approval *Cannon*, 1 F.3d at 1563 ("The constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release has been recognized in other circuits as well.")). As stated in *Davis*, Plaintiff "will have to prove that the defendants were deliberately indifferent to his plight in order to prevail on his Fourteenth Amendment claim." *Davis*, 375 F.3d at 713; *see also Gibson v. Cook*, ___ F.3d ___, 2014 WL 4085821, at *5 (8th Cir. Aug. 20, 2014); *Goldberg v. Hennepin Cnty.*, 417 F.3d 808, 812 (8th Cir. 2005) (describing standard as "criminal recklessness"); *Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013) ("A claim of deliberate indifference includes something more than negligence but less than actual intent to harm; it requires proof of a reckless disregard of the known risk.") (citation omitted).

A.  <u>Goins</u>

The record supports a finding that Goins failed to follow procedures by not delivering a copy of Judge Hogan's order to the Sheriff's Department's Criminal Records Unit.  This was clearly negligent, and very possibly, had it been done, it would have been discovered that Plaintiff was not the right person in the two felony cases as well as in the misdemeanor case.

More problematic, however, is Goins returning Plaintiff to jail, without any further action or comment, after Judge Hogan found that Plaintiff was not the proper defendant with respect to the case before her and ordered his release.  Here, the record supports that Goins had reason to know that the two felony warrants were also in the name of Corey Leonard, not Wright.  The Court believes that "every reasonable official would have understood" that returning Plaintiff to detention without further inquiry on warrants naming the very same person Judge Hogan had found was not Plaintiff, would violate Plaintiff's constitutional rights.  Further, Plaintiff presented evidence–which at this stage the Court accepts as true–that Plaintiff at least alerted Goins to the fact that he (Plaintiff) should have been released.  Although failing to deliver a copy of Judge Hogan's order to the Criminal Records Unit, standing alone, would only constitute negligence, this failure is further evidence that Goins was indeed deliberately indifferent to Plaintiff's due process right to be released from custody.   Goins knew that he was not bringing Plaintiff to Division 25, and under the circumstances of this case, he had a constitutional duty to take some steps to investigate the validity of Plaintiff's continued confinement, or at least to alert the proper persons of the need for further investigation.

In sum, the Court concludes that the facts, viewed in the light most favorable to Plaintiff, demonstrate the deprivation of a constitutional right that was clearly established at the time of the deprivation. Accordingly, the Court will deny Goins qualified immunity on this claim. *See Cannon*, 1 F.3d at 1565 (denying qualified immunity in an arrestee misidentification case where, under the circumstances of the case, a "reasonably well trained officer would have at least attempted to obtain information" from the relevant person to assure that the right person had been arrested); *cf. Gibson*, 2014 WL 4085821, at *5 (affirming grant of summary judgment to two sheriff's deputies because the record established that they were not deliberately indifferent to the plaintiff's right to be released upon a court order releasing him, where the judge issuing the order agreed that the deputies should take the plaintiff back to prison to check on a detainer from another state and the plaintiff was released the next day when it was clarified that the detainer had been removed).[13]

B. <u>Alberti</u>

Plaintiff contends that Alberti, as Goins' supervisor with responsibility for the Sheriff's Department's Criminal Records Unit, failed adequately to train and supervise her employees, including Goins, and that this failure caused the violation of Plaintiff's constitutional rights. In order to prevail on a claim of supervisory liability, a plaintiff must prove that the supervisor had notice of a pattern of unconstitutional conduct, demonstrated deliberate indifference to or tacit authorization of that conduct, failed to

---

[13] To the extent the "shocks-the-conscience" standard applies to the claim against Goins, as suggested in dictum in *Kennell*, 215 F.3d at 828 n.4, the Court concludes this standard is met here for purposes of the qualified immunity inquiry.

take sufficient remedial action, and that the failure proximately caused the alleged constitutional injury. *Parrish*, 594 F.3d at 1002. "[A] supervisory officer is entitled to qualified immunity for a § 1983 failure to train action unless a reasonable supervisor would have known that his training program (or lack thereof) was likely to result in the specific constitutional violation at issue." *Id.*

Here, there is no evidence on the record from which a jury could find the essential elements of a supervisory liability claim against Alberti. Plaintiff has not demonstrated that Alberti had notice of problems related to the failure of deputy sheriffs to deliver court orders related to detainees to the Criminal Records Unit, or failure to investigate further an arrestee's continued detention in circumstances similar to those in this case, or that her asserted failure to train amounted to deliberate indifference to the rights of any individuals.

### C. Sherriff's Department and Murphy in His Official Capacity

The Sheriff's Department is not a suable entity. *Hester v. St. Louis City*, No. 4:13-CV-893 CAS, 2013 WL 2631305, at *3 n.4 (E.D. Mo. June 11, 2013); *Hunter v. Perkins*, No. 4:12CV01592 ERW, 2012 WL 4748066, at *2 (E.D. Mo. Oct. 4, 2012). Plaintiff's claim against Murphy in his official capacity as St. Louis City Sheriff is another form of an action against the City, and it requires a showing that a policy or custom caused the alleged violation. *See Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 800 (8th Cir.1998).

As stated above, to establish a custom or practice by the City, through Sheriff's Department employees, of detaining and incarcerating individuals based on

misidentification, Plaintiff must show (1) the existence of a widespread pattern of similar unconstitutional conduct; (2) deliberate indifference to that conduct; and (3) injury to Plaintiff by the conduct. And to establish a constitutional failure of the City to train and supervise these employees, Plaintiff must show the City's "deliberate indifference" to rights of persons with whom the employees of the Sheriff's Department come into contact. *See City of Canton, Ohio*, 489 U.S. at 388.

Plaintiff's evidence does not present a jury question here on such claims. There is no evidence that the Sheriff's Department had a custom of knowingly accepting custody of prisoners on warrants properly issued to different individuals, as Plaintiff contends, or that they were deliberately indifferent to the rights of such individuals. Nor does Plaintiff provide any authority for the proposition that the Sheriff's Department was alone empowered to refuse custody of individuals brought to it by police on valid warrants. Further, there is no evidence whatsoever that Plaintiff asserted he was wrongly identified at the time the Sheriff's Department assumed custody of Plaintiff. To the extent Plaintiff contends Goins is liable, in his individual capacity, for accepting Plaintiff into custody, this claim fails for the same reasons. The unconstitutional conduct by Goins arose the next day, in a rather unique situation, where a judge ordered a detainee released on one warrant, but other warrants remained for disposition by another judge.

Plaintiff's assertion that he uncovered "an egregious pattern in which the Sheriff's Department has failed to execute court orders by judges in the 22nd Judicial Circuit Court" is not borne out by his evidence. A review of the evidence submitted by Plaintiff of the 81 misidentification cases he uncovered, shows two cases in which the

misidentified arrestee was not released immediately upon a court order for release – one in which the release was one day later, and the other in which the release was two days later. (Doc. No. 116-1 at 5, 10.) This does not show either a pervasive pattern or deliberate indifference to the constitutional rights or arrestees. *See Russell v. Hennepin Cnty.*, 420 F.3d 841, 848-49 (8th Cir. 2005) (affirming summary judgment in favor of municipality where detention center's policy regarding the monitoring of inmates subject to conditional release was not deliberately indifferent to inmates' constitutional rights to be released on time, and the detainee failed to establish that the center's policy caused his prolonged detention).

D.    Division of Corrections (and Glass in His Official Capacity)

The Court accepts as true that on one occasion during his 60-day detention by the Division of Corrections, approximately one month into his detention, Plaintiff told a Correctional Officer about the mistaken identity, and the Correctional Officer told Plaintiff he should not be there. The Correctional Officer was not identified by Plaintiff, nor was he named as a John Doe Defendant. Similar to the claims against the Board and City, liability of the Division of Corrections can only be premised on the existence of a widespread pattern of similar unconstitutional conduct by the Division; the Division's deliberate indifference to that conduct; and injury to Plaintiff by the conduct; or upon the Division's failure to train and supervise its employees. *Cf. Cox v. Dakota Cnty.,* No. 11-CV-2615 PJS/TNL, 2012 WL 5907438, at *2 (D. Minn. Nov. 26, 2012); *Lund v. Hennepin Cnty.*, 427 F. 3d 1123 (8th Cir. 2005) (holding that in order for a detainee in a county jail to prove that the county should be held responsible for a delay in his release

from jail, the detainee must show that his continued detention was caused by a county policy or custom evidencing a level of culpability akin to criminal recklessness).

Plaintiff's evidence related to the Division fails to present a jury question on his claims against this entity (or the City). Here there is no evidence that customs or policies of the Division of Corrections permitted misidentification or that the failure to implement a policy specifically designed to avoid the error that occurred here rises to the level of deliberate indifference to the possibility of constitutional injury. *See Atkinson*, 709 F.3d at 1216 (holding that the absence of a binding, written policy to demonstrate deliberate indifference is patently insufficient).

Similarly, there is little evidence that the Division of Corrections had notice of inadequate training or supervision regarding the issue of misidentification and failed to address it. As such, Plaintiff has not established or raised a genuine issue of material fact that there was a pattern of similar constitutional violations by untrained employees or that the current training regimen or a lack of training was so likely to cause a constitutional violation that the need for the training was patently obvious. *Connick*, 131 S. Ct. at 1360-61. In addition, the record does not indicate that a lack of training actually caused Plaintiff's injuries. *Id.*

Although there is evidence that issues related to misidentification of arrestees became of concern to the entities involved in this lawsuit in the period following Plaintiff's release, there is no evidence that prior to Plaintiff's release the Division of Corrections had actual or constructive notice of such problems such that the failure to

address them would amount to deliberate indifference.  *Id.*  (stating that "notice is the touchstone of deliberate indifference in the context of § 1983").

**State Law Claims**

Having granted all Defendants except Goins summary judgment on the federal claims against them, the Court declines to exercise supplemental jurisdiction over the state law claims against the prevailing Defendants.  *See* 28 U.S. C. § 1367(c)(3); *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 726-27 (8th Cir. 2008).  Those claims are dismissed without prejudice.  The state law claims against Goins remain for adjudication.

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motions for summary judgment are granted with respect to all Defendants except Benjamin Goins, Jr.  (Doc. Nos. 97 and 150 are **GRANTED**, and Doc. No. 103 is **GRANTED in part and DENIED in part**.)


AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of August, 2014.